Jeremiah **TAYLOR, et al., Plaintiffs,**

v.

**OUACHITA PARISH SCHOOL BOARD, et al., Defendants-Appellees.**

Jimmy **ANDREWS, et al., Plaintiffs,**

v.

**MONROE CITY SCHOOL BOARD, Defendant-Appellant,**

**United States of America, Plaintiff-Intervenor-Appellant.**

Nos. 80–3549, 80–3614.

United States Court of Appeals, Fifth Circuit. Unit A

June 11, 1981.

Dissenting Opinion July 23, 1981.

See 653 F.2d 136.

---

Paul Henry Kidd, Monroe, La., George M. Strickler, Jr., Michael G. Collins, Ann Woolhandler, New Orleans, La., for Monroe.

Neil Cogan, Dept. of Justice, Civil Rights Div., Washington, D. C., for the United States.

Stephen J. Katz, Bastrop, La., for plaintiffs.

Robert P. McLeod, David E. Verlander, III, Monroe, La., for defendants-appellees.

Before BROWN, COLEMAN and GEE, Circuit Judges.

GEE, Circuit Judge:

The United States and the Monroe City School Board appeal from orders of the district court, 513 F.Supp. 375, entered in the government's long-running effort to desegregate the public schools within Ouachita Parish, Louisiana. On May 19, 1980, the district court substantially denied the government motion (a motion endorsed by defendant Monroe City School Board) for an interdistrict remedial order; from that denial the government and the city board appeal. On May 28, 1980, the court approved construction of three of five new schools requested by the Ouachita Parish School Board; the city board alone objects to that authorization before this court. For reasons developed below, we affirm the district court's order of May 19 denying the interdistrict relief and dismiss the city board's appeal from the district court's May 28 order allowing commencement of new school construction.

The basic administrative and operational unit for public school education in the State of Louisiana is the parish. In one of only two examples of its kind in the state, since 1920 the City of Monroe and the surrounding Ouachita Parish have maintained separate school systems.[1] This experience was unique in that the systems had overlapping attendance zones; children residing in Ouachita Parish, within or without the city limits of Monroe, could attend school in either system.[2] From their inceptions to the mid-1960's both systems were racially segregated.

The instant proceeding results from the limited consolidation[3] of two separate cases initially filed in the mid-1960's—one by plaintiffs seeking the termination of *de jure* segregation in the city school system, the other for desegregation of the parish system's schools. For background, the long and somewhat tortuous history of judicial efforts at desegregation within the Ouachi-

---

**1.** The other instance is Washington Parish, in which the City of Bogalusa also operates an independent school system.

**2.** The attendance zones of the Washington Parish and Bogalusa school systems do not encroach on each other.

**3.** By memorandum ruling dated May 30, 1979, the district judge ordered that "the action against the Ouachita Parish School Board shall be consolidated with the action against the Monroe City School Board for the limited purpose of the trial of the United States' motion for further relief [substantially, interdistrict relief]."

ta Parish school systems (that is, both city and parish) will be chronicled here as briefly and painlessly as possible.

As was not uncommon in this area and era, the command of *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), was slow to be heard in Ouachita Parish. Although abolished by state statute several years after *Brown*, separate schools for black and white children were still maintained by both parish and city boards at the institution of these suits in the mid-1960's.

In August 1965, black parents and students filed suit in federal district court for the desegregation of the Monroe city school system. *Jimmy Andrews v. City of Monroe*, No. 11,297 (W.D.La., filed Aug. 5, 1965). Recognizing the patent constitutional violation and responding quickly to it, the district judge enjoined the defendant school board in September 1965 from continuing to operate a segregated system of public education. Sparring continued in the district and appellate courts. In 1969, the district judge entered an order "freezing" students in the particular system where they had begun their public school education. The attendance option, then, under normal circumstances, became a one-shot affair; once a student entered a system he was locked into it, absent his meeting any of certain limited exceptions, for the remainder of the years he chose to attend public schools within Ouachita Parish. The flitting from system to system previously allowed under the scheme of overlapping attendance zones was forbidden. In 1970, the United States appeared for the first time in this case amicus curiae. Further litigation resulted in the entry of a consent decree in the summer of 1971 that provided for a neighborhood school plan and the establishment of a biracial committee. Within two years the city board was found in contempt for failing satisfactorily to adhere to the terms of that decree. Shortly after the contempt adjudication, a second consent decree was entered establishing altered attendance zones and patterns within the city school system. In an effort to effect increased desegregation of the Monroe city schools, the decree provided for numerous changes of schools during the students' junior and senior high school years.[4] The plan implemented under this decree of July 27, 1973, governed the Monroe city school system until this most recent order of the district court that prompts this appeal.

The abridged version of the parish case is more briefly told. In July 1966, black parents and schoolchildren filed a class action against the parish school board seeking an end to the maintenance of racial segregation in the parish public schools. *Jeremiah Taylor v. Ouachita Parish School Board*, No. 12,171 (W.D.La., filed July 22, 1966). Within two weeks the district court signed an order enjoining the defendant parish board from continuing its segregative practices and issued a desegregation plan for the school system. As with the city system, the initial plan underwent subsequent alteration and refinement, including the closing of one all-black school and the relocation of some parish attendance zones. The attendance option was here made subject to the "freeze order" as well. In 1971, a biracial committee was appointed by the court to examine the situation in the parish schools; the committee recommended only slight modification of the desegregation plan established by the court's 1970 orders, and that plan as so modified remains in effect to this day.

As reflected in the recounting of their procedural histories, both the parish and the city cases have been subject to the continuing jurisdiction of the district court since the separate findings fifteen years ago that each defendant had created and maintained a *de jure* segregated school system. Recent and separate requests to the district court roused these slumbering cases.

In *Andrews v. City of Monroe*, a group of white parent intervenors, upset at what they considered educationally unsound fac-

---

4. In some cases, a student was required to attend five different schools from the 7th through the 12th grades.

ets of the court-ordered plan, *see* note 4, *supra*, requested the district court to reconsider its 1973 action. Apparently, no party rose to defend the city plan; all acknowledged that it needed serious work. The federal government and the city school board wanted to broaden the inquiry; they argued below, as they do on appeal, that Monroe's problems are inextricably bound up with those of Ouachita Parish and that, because of the particular relationship that has existed between these two systems and that relationship's effects on the segregation patterns in each, an interdistrict remedial order was required.

This latest round in *Taylor v. Ouachita Parish* began with the parish board's motion for district court approval of construction of five new school sites. These new structures were to replace old and overcrowded parish facilities. A hearing was held on August 22, 1978, before the district judge, who took the matter under advisement pending consideration of the government motion for interdistrict relief.

Pursuant to the government's motion for consolidation of the parish and city cases as noted above, the court, on May 30, 1979, ordered consolidation for "the limited purpose of the trial of the United States' motion for intra and interdistrict relief." The two lawsuits were not formally consolidated. Ouachita Parish was not made a party to the city suit, nor did the government formally intervene in the parish case. The city board filed a third-party complaint against the parish, which was disallowed by the court.

On July 9, 1979, the government's motion came on for hearing before the district judge. In addition to the interdistrict question, the pretrial order indicated that the court would hear evidence on the inadequacy of the current city desegregation plan and the white-parent intervenors' suggested alterations. Purely intradistrict questions about desegregation in the parish schools, that is, parish actions shown to have no direct and substantial segregative effect within the city school system, were not to be addressed in this proceeding; no party to

the parish suit was yet seeking an alteration of that district's desegregation plan. The three days of hearings were devoted largely to development of the government's case urging the need for a substantial interdistrict remedy. The exact nature of that remedy, whether cross-district transportation of students or court-ordered consolidation of the two systems, was left unspecified; crafting the particular remedy could await demonstration of its need.

A voluminous record was developed in the hearing, including the testimony of thirteen witnesses (two school superintendents, one former superintendent, three attendance officers, and seven principals from the parish system) called by the government and the introduction of scores of exhibits on school populations and attendance patterns over the previous decade. While nominally a defendant in this hearing, the city board, as on this appeal, was aligned with the government and fully supported its motion for interdistrict relief. The city board, the government, counsel representing the original city suit plaintiffs, and counsel for the intervenors agreed that the city desegregation plan needed revision. The hearing was little concerned with the internal policies of the city school system. A special master was appointed by the district court to study the city's needs in greater detail and make further suggestions for more effective intradistrict relief; the particulars of any changes in the city plan are not before this court on appeal.

The district judge issued orders and opinions in each case to the following effect:

(1) The overlapping attendance zones and the student attendance option were to be dissolved; students residing within the city limits were to attend city schools; those outside Monroe were to attend parish schools.

(2) Three of the five proposed parish school facilities could be constructed as planned; consideration of the remaining two sites would be stayed until the effects of altered attendance patterns in the two systems could be examined.

(3) Mechanisms were established (*e. g.*, appointment of a special master) to suggest altered intradistrict remedies for the Monroe city school system.

(4) No interdistrict remedy in the nature of consolidation of the two districts or cross-district assignment of students was ordered.

On this appeal, number (3) is unassailed by any party; complaints on that issue will await more specific action by the district court. Number (1) is likewise found unobjectionable by all but is considered inadequate relief by the city board and federal government for what they characterize as a serious interdistrict problem. The city board alone complains of the court's approval of the new school construction in number (2) above. The government and the Monroe school board chiefly argue on this appeal that the trial court erred in refusing to order an interdistrict desegregation remedy (number (4) above). With respect to that last issue, appellants additionally complain of the district court's exclusion of certain proffered expert testimony.

*Denial of an Extensive Interdistrict Order*

The careful opinion of the district judge indicates the thorough consideration given the government's request for an interdistrict remedial order. The court found that the overlapping attendance zones and the reciprocal transfer provisions between city and parish "have a substantial segregative effect on the two systems." 513 F.Supp. at 390 (W.D.La.1980). The parish system was becoming increasingly a white system, the city system, black. The court "conclude[d] that a limited interdistrict violation has been established." *Id.* at 391. Recognizing the message of *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971), "that the nature of the violation

determines the scope of the remedy," the district judge determined that "[t]he remedy tailored to redress this specific wrong is that the two school systems will no longer geographically overlap." 513 F.Supp. at 392. The limited interdistrict violation called for an appropriately limited remedy—the eradication of the attendance option and the consequent confinement of each system essentially to the school facilities and student populations physically within their exclusive geographic boundaries.[5] No further interdistrict order was to issue.

██ We affirm the district court's denial of substantial interdistrict remedial action but for a reason more fundamental than the *Swann* "balancing test"; where the district judge found a "limited constitutional violation" in the maintenance of this option, we perceive no interdistrict constitutional violation at all. "[W]ithout an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy." *Milliken v. Bradley*, 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974).

Appellants resurrect before this court a factual argument squarely rejected in the court below—that the parish and city school systems were functionally one and not the "separate and autonomous" districts the administrative integrity of which *Milliken* strongly defends. *Id.* 418 U.S. at 739–43, 94 S.Ct. at 3125–26. From that factual proposition comes their legal conclusion that the requested remedy is actually intradistrict and not interdistrict in nature and that the trial judge erred in scrutinizing the request under *Milliken v. Bradley* standards.

██ Finding of Fact No. 7 in the opinion below reads: "MCSS [the city system] and the OPSS [parish system] are completely separate and autonomous. They have no

---

5. The parish's largest elementary-junior high, Ouachita Parish Elementary School and Junior High, and one of its largest high schools, Ouachita Parish High, are in areas annexed by the city subsequent to their construction. The problems in continuing parish operation of these schools were acknowledged by the dis-

trict judge in his opinion, but initial efforts at resolution were left to the local school boards. The judge pointed out two of the options available to the parish—bus parish residents into the schools or sell the schools to the city system. More certain action awaits the remedy phase of these proceedings.

joint activities and no liaison office between the two systems. Except for a Parish-wide sales tax shared by both systems, there exists no interlocking fiscal policy." 513 F.Supp. at 383. A review of the record, including the testimony of the city school superintendent, Dr. Seegers,[6] indicates that the district court's determination is not clearly erroneous and thus cannot be disturbed on appeal. Fed.R.Civ.P. 52.

There are, certainly, factors suggestive of an interlocked relationship between the systems. As noted, the systems share a parish-wide sales tax revenue base. While the two systems have separate boards and officials, the residents of the city, as parish residents, are allowed to vote in both city and parish school board elections; this "dual citizenship" is not enjoyed by parish residents outside the Monroe city limits.[7] Two parish schools, originally built outside Monroe's boundaries, have been absorbed within the city limits by urban sprawl. And, most notably, students have resided in attendance zones within both districts and been able, within court-imposed limitations of the last decade, to choose which system's schools to attend. But as recently noted by this court, "cooperation between two or more autonomous school districts does not negate their independent identities." *Lee v. Lee County Board of Education,* 639 F.2d 1243, 1256 (5th Cir. 1981). This cooperative "sharing" of students does not destroy the separate natures and identities of the two systems. In governance, planning, curriculum, hiring, and budgeting, Ouachita Parish and the City of Monroe have long maintained "bona fide, independent school districts." *Id.*

Once it is established that the requested desegregation remedy requires crossing district lines, the key for judicial consideration of such action becomes *Milliken v. Bradley, supra.*

> Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of a state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation.

418 U.S. at 744, 94 S.Ct. at 3127. The district judge, alert to the *Milliken* standard, found the existence of the attendance option itself to be a constitutional violation "within one district that produces a significant segregative effect in another district." 513 F.Supp. at 388. Two thousand white children physically residing within the city limits but attending parish schools, when the city system is approximately 70 percent black and the parish system nearly 80 percent white, was seen by the judge as neces-

---

6. Under cross-examination by parish counsel, the city superintendent testified as follows:

Q Now you have essentially been involved or had contact with the Monroe City System, sir, with a few small breaks since 1954, I believe that you said?

A Since 1953.

Q During that time is it correct that the City hired its own teachers and its own employees in the City System?

A Yes, correct.

Q And does the City System develop its own curriculum programs, instructions and under the various guidelines and steps as set forth by the education board?

A That's correct.

Q Does the City establish its own bus routes, transportation and hire those people to operate the buses?

A That is correct.

Q And to the best of your knowledge does the Parish do all of those things without any involvement with the City?

A That is correct.

Q As far as the day to day operation of both boards and the employees of both boards, and all of the different ways that they operate, Doctor, do they operate independently of each other?

A Yes, sir.

7. This entanglement is not at present the fault of Louisiana or of local authorities. La.Const. Art. 8, § 10(b), would do away with this "dual citizenship"; it is not currently in effect for lack of requisite Department of Justice approval of action altering voting rights in a jurisdiction subject to the strictures of the Voting Rights Act.

sarily worsening the segregation problem in the city school system. We need not here quibble with the judge's factual finding of significant segregative effect, for we affirm his denial of a substantial interdistrict order because of the absence of a legally valid finding of discriminatory intent.

 A showing of segregative effect alone is insufficient under *Milliken* to support interdistrict relief. "[W]ithout an interdistrict *violation* and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy." 418 U.S. at 744, 94 S.Ct. at 3127 (emphasis added). If government action, not violative of the Constitution, produces a segregative effect, that is certainly unfortunate but is not, generally, redressable in federal court. For there to be a violation of the Constitution there must be discriminatory intent. *Columbus Board of Education v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Lee v. Lee County Board of Education, supra.*

No evidence was adduced at trial showing discriminatory intent in the creation, maintenance, or operation of the overlapping zones and attendance option. The district judge acknowledged that "no party contends that the separate school systems were established for the purpose of racial segregation." 513 F.Supp. at 382. That contention, indeed, could not confidently be asserted, as the separation of parish and city systems dates from a time in which racial segregation in education was accomplished under state statutes sanctioned by contemporary constitutional interpretation. *See McMillan v. Escambia County, Florida,* 638 F.2d 1239, 1244 (5th Cir. 1981) (recognizing that at-large system for election of county commissioners was not motivated by racial animus because "there was such widespread · disfranchisement of blacks by that time [1901] that they did not represent a political threat").

Actions neutral at their inception may, of course, be perpetuated or maintained for discriminatory purposes, and that perpetuation or maintenance itself may be found a constitutional violation. But here again, as recognized by the district court, that was not the claim of any party to this dispute: "Nor does any party claim that the boundaries between the two systems have been drawn with a racial animus or that the two separate systems have been maintained to perpetuate racial segregation." 513 F. Supp. at 382. Extensive documentary evidence and trial testimony failed to reveal that attendance zones had been originally drawn or subsequently manipulated by the districts to achieve segregative results; indeed, in both cases attendance zone lines had received the approval of the district court in earlier proceedings.

A great deal of questioning of parish school officials by the government and the city board went to the administration of interdistrict transfers under the court-imposed "freeze order." The evidence fails to show selective enforcement of the transfer order. The parish superintendent, questioned about procedures to insure against abuse of the freeze order, testified that the restrictions on interdistrict transfers had "been strenuously enforced." The testimony of the superintendent and the various parish school principals and the parish attendance officers, in the words of the district judge, "conclusively establish[ed] that the freeze order was uniformly and rigidly enforced without regard to a student's race." 513 F.Supp. at 385. Contrary evidence was offered showing that at most 93 students, both black and white residents of the city, were attending parish schools in violation of the freeze order.[8] No evidence was offered that this "district jumping" was caused by, acquiesced in, or aided by any parish school officials. The evidence was to the contrary, showing diligent efforts by parish officials to halt any impermissible transfers into the parish system.

---

**8.** These students would typically be city residents who had initially entered the city system and then without a bona fide change of residence transferred to a parish school.

The attendance officers testified that they had caught students attempting to enter the parish system in violation of the court's order and had prohibited such transfers. Rather than promoting district jumping, the responsible parish officials conscientiously attempted to eradicate the practice.

Our review of the record for direct evidence of discriminatory intent in the operation of the attendance option comports with that of the court below: "The record is simply devoid of any direct evidence impugning [sic] a segregative intent to Ouachita Parish school authorities." *Id.* at 387. As to his further analysis of interdistrict violation, however, we part company with the district judge's reasoning but not with his result.

After remarking on the barren state of the record with respect to direct evidence of discriminatory intent, the district court wrote: "However, in one-race school systems, this intent may sometimes be inferred." *Id.* at 387. The government and the city board urge that we entertain an inference similar to that accepted by the Supreme Court in *Wright v. Council of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), in analyzing the Ouachita Parish experience. The inapplicability of a *Wright* analysis of inference and presumed intent has been well demonstrated by this court's recent opinion in *Lee v. Lee County Board of Education*, 439 F.2d at 1262–63. Not disposed to reinvent the wheel, we merely reiterate and adhere to the reasoning of that opinion. Policies and procedures appropriately applied in intradistrict segregation cases, as *Wright* is properly classified, cannot be transported uncritically into the context of alleged interdistrict violations. *Id.* 439 F.2d at 1263. The government's reliance on inferences of intent, rather than direct evidence of such discriminatory animus, is unsurprising; its theory at trial was that the two systems were actually one and that *Milliken v. Bradley's* requirement that violation be shown as well

as effect was inapplicable to this case. The government counsel stated: "Because these districts have never been separate and autonomous with respect to student assignments then it therefore follows that it is not necessary to show intent but merely effect as required by *Wright*."[9] With that argument properly rejected and intentional segregation a necessary showing, the government was reduced to arguing for an inference of discriminatory intent, as there was a failure of proof of discrete acts of discrimination in the administration of the attendance option. And somewhat in the nature of winning the battle while losing the war, the government found the district judge sympathetic to its argument for basing a finding of interdistrict violation on a presumption or inference of intent but noticeably unreceptive to its requested relief—*i. e.*, a comprehensive interdistrict desegregation order.

The district court discovered an interdistrict violation (albeit a "limited" one) by presuming an intent to discriminate in the overall operations of the two school systems:

> [I]n the anomalous situation facing the court with two political entities servicing the same geographic area, it is fair to presume an intent to segregate and therefore find a constitutional violation when the two systems operate with predominantly one-race schools 25 years after *Brown*.
>
> Accordingly, this court concludes that a limited interdistrict violation has been established.

513 F.Supp. at 391.

We do not follow the district judge down that path, for we find his conclusion of *interdistrict* violation based on presumed intent to be the result of legal error.

█ It is well established that a school district with a history of operation of *de jure* segregated schools is under a continuing constitutional obligation to eradicate the vestiges of that dual school system.

9. In case that message was not clear, the government lawyer said at the close of his argument in the district court: "Once again we are saying for the eleven hundredth time we are not contending this is a *Milliken* case . . . ."

The failure sufficiently to satisfy this obligation continues the constitutional violation. *Swann v. Charlotte-Mecklenburg Board of Education, supra.* The district judge found both school systems to have failed in their efforts to decrease significantly the large numbers of one-race schools.[10]

■ We do not disturb this finding. Rather, for an analysis of interdistrict violation, we question the relevance of this finding, taken either as indication of discriminatory intent in the operation of the overlapping attendance zones (the apparent use by the district judge) or as a distinct constitutional violation itself supporting interdistrict relief.

With respect to the first possible use of this failure to eradicate vestiges of *de jure* segregation, we cannot perceive the connection between it and the operation of the attendance option. If there be no connection, then the failure to sustain the burden of fully desegregating the parish schools cannot be said to provide a presumption of intent to discriminate in the maintenance of the attendance option. We have already noted the absence of official misconduct in the creation of the overlapping zones and in the policing of the attendance option. No evidence was offered showing any effect of the existence in the parish system of a significant number of one-race schools on the exercise of this option by the city students. Indeed, since the trial judge found a similar failure on the part of the city system, it appears that the sorry state of desegregation in the parish cannot be presumed to have affected significantly the

flow from the city of white students. White city residents desirous of avoiding desegregation had little need to flee the city system. Record evidence indicated that most white city residents attending white-majority parish schools would have, in the absence of the attendance option, been zoned into white-majority city schools.[11] As previously indicated, there was no evidence that the parish actively lured students from the city system. The attendance option operated both ways, and some parish residents attended city schools.

We turn now to a brief consideration of the second possible use of this finding of constitutional violation in the failure of the parish board fully to eliminate its dual school system: that segregation of the parish schools was itself an interdistrict constitutional violation satisfying the *Milliken* standards for interdistrict relief. The district judge, it should be noted, does not appear to have viewed this failure of Ouachita Parish to eliminate vestiges of past segregation as itself the interdistrict violation. But assuming that the continuing segregation within the Ouachita Parish school system can be treated as an interdistrict violation, one searches the record in vain for evidence of a segregative effect within Monroe *caused by* the Ouachita Parish situation. Monroe has manifest problems: all parties agree that renewed efforts must be attempted to desegregate that system, and the particular methods are now being prepared under the supervision of the district court. These concentric school districts share a general problem: vestiges of an earlier *de jure* system of school segrega-

10. When the matter was heard in the district court, the student populations of four of the eighteen city system schools were 90% or more of one race; the parish system's figure was sixteen of thirty-two. With respect to the alleged violation in failing to decrease the number of one-race schools in its system, the parish board makes an argument that need not concern us here: that the current attendance zones were drawn up under court supervision and have been policed diligently and conscientiously by the board; any attempts to alter those zones and effect greater desegregation would have required additional court action. How,

the parish asks, can it be violating the Constitution in implementing a court-ordered plan of desegregation? We simply note that conscientious adherence to the command of *Swann* may require more of the school board than simply rigorous adherence to the often narrow results of the ponderous litigation machinery.

11. No allegation was made and no proof offered that this particular result—*i. e.*, the coincidence in the two systems of similarly situated single-race schools—was in any way the result of intentional segregative acts on the part of the boards acting separately or in concert.

tion. But they cannot, true to the requirement of *Milliken v. Bradley*, share a common solution. The problems of segregation within the city and the parish systems are properly redressable, if at all,[12] as intradistrict violations in appropriately separate proceedings. That process is currently in action in the court below in the city case; the parish case awaits its treatment.

The above discussion began with a fairly stout assumption: that the failure of Ouachita Parish effectively to desegregate its schools could be considered an *interdistrict* violation under *Milliken v. Bradley*. The noted absence of any showing of interdistrict effect from this failure highlights a definitional problem with "interdistrict violation": is there substance to the term beyond a showing of interdistrict effect? Assume a school system has intentionally segregated its students by race; unknown to and undesired by that system, its actions have undermined a neighboring district's efforts at desegregation: has there been a *Milliken* interdistrict violation? Some language in *Milliken* might support an affirmative answer: to order an interdistrict remedy, "it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district." 418 U.S. at 744, 94 S.Ct. at 3127. There is no explicit statement that the requisite segregative intent be not simply to discriminate within the offending system but further a clear intent to cause segregative effects within the neighboring district. For disposition of this case an answer is unnecessary; whether interdistrict segregative effect is the sole element of an interdistrict violation need not here be addressed, for a showing of effect is certainly independently necessary under *Milliken* to support an interdistrict remedy; as found above, that showing of effect was not made here. We note in passing, however, that should interdistrict effect alone transform otherwise intradistrict unconstitutional action into an interdistrict violation, then the *Milliken* insis-

tence that "without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy," *id.*, contains a redundancy: the only interdistrict thing about the violation would be its effect.

Basically, this case presents the intradistrict problems of two separate and autonomous school districts. And no matter how serious the problems or how difficult the intradistrict solutions, *Milliken* teaches that interdistrict violation and interdistrict effect together must support interdistrict remedy.

### Termination of Attendance Option

■ Alert to the command of *Swann* that the relief narrowly fit the violation, the district judge, confronted with what he viewed as the limited interdistrict violation implicit in the operation of an attendance option between two formerly *de jure* segregated systems, ordered the appropriately tailored remedy: the termination of the overlapping zones and the attendance option. Each system was to be geographically secure, drawing students from and generally operating schools in only those areas within the exclusive jurisdiction of each. The operations of these two systems, termed "anomalous and anachronistic" by the district judge, 513 F.Supp. at 377, were fundamentally altered. That alteration poses a conceptual difficulty in light of our holding that the attendance option was not an interdistrict violation, limited or sweeping. In school desegregation cases, federal courts sit to correct constitutional error, not to rectify state legislative anomalies or anachronisms. Without a finding of constitutional violation in the creation or operation of this attendance option, we nevertheless affirm its elimination at the hands of the district court.

■ First, no party objects to the court's action as an illegitimate or unwarranted interference in the affairs of a local school

---

12. We do not here consider the correctness of the district judge's conclusions about the failures of each district to deal with the problems

of lingering single-race schools. Nothing said in this opinion should be construed as a comment on matters not before us on appeal.

board. We perceive no need, in this instance, in the name of federalism to strike down federal court actions unobjected to by any local party. Second, the desegregation efforts in each of these districts have been under the continuing supervision of the district court since the initial findings of *de jure* segregation in the 1960's. In the circumstances of this case and with the acquiescence of all parties, we do not find the district judge to have exceeded his supervisory powers in issuing an order designed to augment desegregation within both school systems.

### Exclusion of Proffered Expert Witness Testimony

The government and the city school board complain of the district judge's refusal to receive testimony offered by the government's expert witness, Dr. Diana May Pearce. Dr. Pearce is apparently an able sociologist with a fine academic record; her previous experience in school desegregation lawsuits consists of participation in the preparation of an appendix to plaintiffs' brief to the Supreme Court in *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). At the time of this hearing, Dr. Pearce was engaged in an extensive study of residential segregation in sixteen American cities, not including Monroe. The district judge was originally disposed to allow her testimony but rejected it upon revelation of her perceived unfamiliarity with the particular situation that obtains in Ouachita Parish. In his written opinion the judge explained: "This court is slow to apply the stamp of . 'expert' on a witness, academic qualifications notwithstanding, unless the purported expert has had an opportunity to view the individual situation with all its vagaries." 513 F.Supp. at 393.

That ground for exclusion, as vigorously pointed out by appellants' counsel, is not an explicit condition found in the Federal Rules of Evidence on expert testimony. But the admission of expert testimony is largely within the sound discretion of the district judge. In this bench trial, the judge determined that theories unconnected to local practice offered by Pearce were simply not going to be helpful in his efforts as finder of fact. The government was not unfairly surprised by the judge's ruling; a requirement of particularized local knowledge was not developed for this lawsuit alone but has been the policy in the district court in a number of desegregation matters. The government's problem arose from its last-minute acquisition of the expert; originally thinking an expert's assistance unnecessary to the proof of this case, the government secured Dr. Pearce only after instructions from the district judge's law clerk that such testimony was expected.

■ Even if this court should find the district court's requirement for expert testimony in school cases overly restrictive or unwise (which we do not), the court's error does not appear on this record to have prejudiced the government's case. A proffer was made of Dr. Pearce's testimony, but unfortunately the record contains only a promise of transcription. The trial transcript reflects that the proffer was taken before the court reporter and that it was to be transcribed upon request. The briefs of the government and the city board, the parties advancing Pearce's testimony, indicate only that the proffer is forthcoming. It has not arrived. Unable to read what Dr. Pearce had to say, we rely on the characterization of her testimony by those who heard it. In its brief to this court the government states:

> The expert's testimony, outside the hearing of the court, was that interdistrict attendance had a significant effect not only upon school segregation in the districts but also upon housing patterns in the districts. She testified that in those city neighborhoods where large numbers of city whites were attending parish district schools, not only the city schools but also the neighborhoods became blacker. In those neighborhoods where few city whites were attending parish district schools, the city schools and the neighborhood stabilized. Thus the district court excluded testimony which supported the

presumption established in *Swann* and *Keyes* . . . and which required the court (in the absence of evidence from defendant to the contrary) to order an interdistrict remedy.

However fascinating such findings might be,[13] in the view we have taken of this case that showing was irrelevant to the proper disposition of this motion for interdistrict relief. We have found the cross-district attendance option not to be an interdistrict constitutional violation; any effect on "white flight" is lamentable but not the basis for interdistrict desegregation orders.

### Construction of New Parish Schools

In the revivification of *Taylor v. Ouachita Parish*, the parish board requested district court approval of its plans for construction of five new parish school facilities. The matter was taken under advisement by the district court after a hearing; its proper disposition was found to rely in part on resolution of the then pending government motion for an interdistrict desegregation order. After disposing of that government motion by its order of May 19, 1980, the district court approved the construction of three of the five requested new facilities. The others were not finally disapproved but further consideration stayed pending study of the results on parish attendance of the court's order abolishing the interdistrict attendance option.

The city school board alone complains of this allowance of new school construction. It argues that a proper analysis of the situation would reveal that the only effective remedy is an interdistrict one and that these new parish facilities, replacements for schools now overwhelmingly of one race, will worsen rather than improve that interdistrict problem. We need not evaluate the logic of the city's position or reconsider the trial court's exercise of judgment here. We dismiss the city's appeal from the district court's order allowing construction to proceed on the three new parish school facilities. *Andrews v. City of Monroe* and *Taylor v. Ouachita Parish* remain separate district court actions. As noted, a "limited consolidation" was ordered for the purpose of trying the government's motion for interdistrict relief. The construction of these schools was not viewed by the government as part of its requested relief; it did not oppose construction in the district court and does not argue against it on appeal. Except as affected by the interdistrict motion, the parties and issues in the two cases remain separate and distinct. The city was never and is not now a party in the district court action of *Taylor v. Ouachita Parish* in which the construction order was issued. Generally, one not a party lacks standing to appeal an order in that action. 9 Moore's Federal Practice ¶ 203.06, at 3–20.

> [I]t has long been the law, as settled by this court, that "no person can bring a writ of error (an appeal is not different) to reverse a judgment who is not a party or privy to the record" (citation omitted); and in *Re Leaf Tobacco Board of Trade*, 222 U.S. 578, 32 S.Ct. 833, 56 L.Ed. 323, it was announced, in a per curiam opinion, as a subject no longer open to discussion, that "one not a party to a record and judgment is not entitled to appeal therefrom" . . . .

*United States ex rel. Louisiana v. Boarman*, 244 U.S. 397, 400, 37 S.Ct. 605, 607, 61 L.Ed. 1222 (1917).

The city board filed an "Answer to Plaintiff-Intervenor's Original and Supplemental Motions for Consolidation of Cases and Joinder of Parties and Motion for Intradistrict and Interdistrict Relief and Third-Party Demand" in the district court on January

---

**13.** Lamenting the government's failure properly to present this expert witness testimony, the district judge wrote:

"Such a showing was crucial to the government's case seeking total consolidation of the two school system." 513 F.Supp. at 392. As indicated in this opinion, we reject the characterization of her testimony as "crucial" in the context of this case. But in a proper case, where an interdistrict transfer option had been established or administered in an unconstitutional manner, testimony of the transfer option's effect on residential segregation would certainly be important, since that relationship is not intuitively obvious to the lay reader.

9, 1979. In that filing the Monroe board indicated its substantial agreement with the motions filed by the United States and asserted a putative claim against the parish board for alleged discriminatory actions affecting the city system. The major relief sought in this complaint was the enjoining of construction of the new parish schools. By order of May 30, 1979, the district judge refused leave to file the third-party demand and had it stricken from the pleadings. No appeal has been taken from the judge's refusal to allow the third-party complaint. The city board never became a party to *Taylor*, and the parish board has never been a party to *Andrews*.

The narrow exceptions to the standing requirement are not here applicable. 9 Moore's Federal Practice ¶ 203.06, at 3–23. The city board was not "privy to the record" of the proceedings before the district judge on construction of the parish schools. 1B *id.* ¶ 0.411[6]. Its aborted third-party claim was filed well after the parish request for construction approval was taken under advisement by the court in August 1978. The city board's attempt to drag the parish board into *Andrews* as a third-party defendant does not make it privy to the record in earlier proceedings in *Taylor*.

From what appears in the record, the plaintiff class in *Taylor* does not oppose the new school construction. In the absence of objection from a party with standing to appeal, we cannot second-guess the district judge, and consequently we dismiss the city board's appeal from the court's order of May 28, 1980.

### Attorneys' Fees

■ In the final sentence of its brief to this court, the city school board requests an award of attorneys' fees and costs of appeal from the parish board. Neither in the district court nor before this court can the city board be considered a "prevailing party" within the meaning of 42 U.S.C. § 1988. The city board's cursory request is summarily denied.

### Conclusion

The city board urges this court to recognize that so-called "white flight" from Monroe to the surrounding Ouachita Parish will continue unabated in the absence of a substantial interdistrict desegregation effort. White flight from our cities is indeed a disturbing problem. That a number of social and economic factors unrelated to race contribute to it is apparent. That the unfortunate desire of private citizens to escape desegregated public education likewise contributes to that flight cannot be gainsaid. But it is beyond the power of a federal court always to make the world a better place. The same Constitution that insures to all persons the equal protection of the laws stays our hands absent state-sanctioned or state-instigated violation of that document's protections. U.S.Const. Amend. X.

Applying the legal standard of *Milliken v. Bradley* and finding no interdistrict violation by the parish board with a substantial segregative effect in the city system, we affirm the district court's denial of the government motion for interdistrict relief. We also affirm the unobjected-to termination of the interdistrict attendance option and dismiss the city board's appeal from the order allowing new parish school construction.

AFFIRMED.

JOHN R. BROWN, Circuit Judge:

For reasons stated in an opinion to be filed shortly, I dissent in part from the majority's disposition of this appeal. I concur, however, in the determination of the panel to release the majority opinion forthwith for the guidance of the parties and their counsel.