**Jeremiah TAYLOR et al., Plaintiffs,**

v.

**OUACHITA PARISH SCHOOL BOARD et al., Defendants-Appellees,**

---

**Jimmy ANDREWS et al., Plaintiffs,**

v.

**MONROE CITY SCHOOL BOARD, Defendant-Appellant,**

**United States of America, Plaintiff-Intervenor-Appellant.**

**Nos. 80–3549, 80–3614.**

United States Court of Appeals, Fifth Circuit. Unit A

Opinion Filed June 11, 1981. See 648 F.2d 959.

Dissenting Opinion July 23, 1981.

Appeal from the United States District Court, for the Western District of Louisiana. Tom Stagg, Judge.

Neil Cogan, Dept. of Justice, Civil Rights Div., Washington, D. C., for U. S. A., in both cases.

George M. Strickler, Jr., New Orleans, La., Paul Henry Kidd, Monroe, La., for Monroe, in both cases.

Stephen J. Katz, Bastrop, La., for plaintiffs, in both cases.

Robert P. McLeod, Monroe, La., for defendants-appellees, in both cases.

Michael G. Collins, Ann Woolhandler, New Orleans, La., for Monroe, in No. 80–3614.

David E. Verlander, III, Monroe, La., for defendants-appellees, in No. 80–3614.

Opinion Filed June 11, 1981. See 648 F.2d 959.

JOHN R. BROWN, Circuit Judge, dissenting:

I respectfully dissent to the Court's refusal, 513 F.Supp. 375, to recognize the propriety of, and need for, an interdistrict remedy, and its failure to require that the District Court demand a meaningful (and further) interdistrict remedy.[1]

---

**1.** On the assumption that further interdistrict relief is not justified, I have no objection to the Court's action on "construction of new parish schools", *Taylor v. Ouachita Parish School Board*, 648 F.2d 959, 972 (5th Cir. 1981), or attorney's fees, *id.* at 972.

As Justice Rehnquist so recently stated, the "present case is a good example of Justice Holmes's aphorism that 'a page of history is worth a volume of logic'. *New York Trust Company v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921)", *U. S. Postal Service v. Greenburgh Civic Associations*, —— U.S. ——, ——, 101 S.Ct. 2676, 2680, 69 L.Ed.2d 517 (1981). Here, however, it is not just a page of history. It covers volumes and a period of time when racial segregation of public schools in Louisiana was not merely permitted but required,[2] and is one calling for action by the District Court and by us on the Court of Appeals. Somehow, it is as though *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), not only established "new" law but obliterated altogether this history which includes as its most recent and current chapter a continuation of the constitutionally forbidden dual schools[3] in each of the Monroe City and Ouachita Parish so-called school systems.

But this is not a *Milliken* case. It is not a *Milliken* for at least two reasons.

In the first place, in *Milliken* it was in the Detroit school district, comprising the city of Detroit, in which alone there was any unconstitutional racial discrimination. As to the 85 outlying school districts in the three-county Detroit metropolitan area, and the 53 of the 85 included in the District Court's interdistrict remedial plan, "there had been no claim that these outlying districts had committed constitutional violations", 418 U.S. 717, 730 n.11, 94 S.Ct. 3112, 3120 n.11, 41 L.Ed.2d 1069, 1083 n.11.[4]

Unlike the record in *Milliken*, the record here demonstrates with the full imprimatur of the District Judge the operation of two school systems within the same geographical area, each and both of which had been and were now guilty of unconstitutional discrimination on account of race in the maintenance of schools and the assignment of pupils both within and between the two

---

2. *See* the unpublished District Court's opinion, R. 54, *citing* La.Const. art. 12, § 1 (1932); La. R.S. 17:331–334 (page references are to the photocopy of the opinion made a part of the record on appeal, and do not reflect the typed page numbers of the original typewritten opinion or the page numbers of the record itself).

3. *See* the District Court opinion:

Accordingly, it is clear from the facts and statistics introduced into evidence at trial that both the Monroe City School System and the Ouachita Parish School System are composed of predominantly one-race schools. Neither system has completely fulfilled its duty to remove all vestiges of the dual school system. (R. 55).

\* \* \* \* \* \*

Since 1955, the Ouachita Parish School Board and the Monroe City School Board have been under a continuous constitutional obligation to disestablish their respective dual school systems. Both have failed to discharge this duty, as indicated by the presence of so many one-race schools in each system. The failure or the refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment. (R. 68).

\* \* \* \* \* \*

Considering the current pervasive racial segregation in the two systems, the court feels that it is warranted in finding that the school board's failure to fulfill their affirmative duties has tended to perpetuate or in-

crease segregation in the two systems. (R. 69).

\* \* \* \* \* \*

In both Monroe City and Ouachita Parish, segregation by law has ended, but neither this event nor subsequently required affirmative steps to desegregate the schools has removed all vestiges of the dual school system. (R. 69).

\* \* \* \* \* \*

However, in the anomalous situation facing the Court with two political entities servicing the same geographic area, it is fair to presume an intent to segregate and therefore find a constitutional violation when the two systems operate with predominantly one-race schools twenty-five years after *Brown*. (R. 70).

4. The Court stated:

The record before us, voluminous as it is, contains evidence of de jure segregated conditions only in the Detroit schools; indeed, that was the theory on which the litigation was initially based and on which the District Court took evidence.

418 U.S. at 745, 94 S.Ct. at 3127.

The Court also stated:

Disparate treatment of white and Negro students occurred within the Detroit school system, and not elsewhere, and *on this record* the remedy must be limited to that system.

418 U.S. at 746, 94 S.Ct. at 3128.

systems,[5] under a legal structure which blended political authority and fiscal resources.

Second, and more significant, *Milliken* is bottomed on the proposition that rejects the "notion that school district lines may be casually ignored or treated as a mere administrative convenience" because there is no "single tradition in public education ... more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to the quality of the educational process", 418 U.S. at 741, 94 S.Ct. at 3125. The Court went on to point out that "local control over the educational process affords citizens an opportunity to participate in decision-making, permits the structuring of school programs to fit local needs, and encourages 'experimentation, innovation, and a healthy competition for educational excellence'", 418 U.S. at 742, 94 S.Ct. at 3126, *citing San Antonio School District v. Rodriquez,* 411 U.S. 1, 50, 93 S.Ct. 1278, 1305, 36 L.Ed.2d 16, 52 (1973).

This contemplates the maintenance and continued operation of two or more school systems as truly independent and autonomous within the powers granted by the state government. In the *Milliken* sense, that is lacking here in several major respects.[6]

At the very outset, the Ouachita school board is not the creature solely of parish residents living outside of the boundaries of the city of Monroe or West Monroe. It is the creature of them plus the voter residents of the city.[7] Through the power of the ballot and the threat of recall or defeat of incumbents, resident voters living in the two cities can either control or mightily influence the adoption or abandonment of any educational policy, practice or decision including, of all things, selecting the most important of all employees—the school superintendent.[8]

More important than potential political control or heavy influence is the virtual pooling and sharing of tax revenues to support the two systems. As both the District Court and this Court expressly recognize, the two systems share a parish-wide sales

---

5. In addition to its findings, *see* note 3, *supra* the District Court also found:

> As the figures in App. VI clearly show (R. 94–95), the MCSS went from 50.5 percent white in 1965 to 27.3 percent in 1978–79. If the city could join with a system that was 77.5 percent white, it could tap the student pool needed to stem this alarming white exodus. (R. 51).

Moreover, the District Court found:

> In 1977–78, 9,184 students attended Monroe city schools; 6,212 students were black—67.6 percent. Monroe had four schools that were 90 percent or more one race.... In 1978–79, 9,168 students attended Monroe schools; 6,667 or 72.7 percent were black. The Monroe city system had 18 schools, six of which were originally built for black students and 12 for white students.
>
> In 1977–78, there were 18,754 students enrolled in the Parish system; of these students, 14,610 or 77.9 percent were white and 4,144 or 21 percent were black. Ouachita Parish had 16 schools which are over 90 percent or greater one race. (R. 54).

6. Insofar as it reflected conclusions based upon Louisiana law, I do not quarrel with the District Court's finding (7) that "MCSS and the OPSS are completely separate and autonomous.

They have separate school boards and separate officials...." (R. 55).

7. As we must assay the situation in the light of facts existing at the time of the District Court's decree and the time of our decision, this Court itself points out (*see Taylor* at 965 n.7) this one-way dual citizenship continues despite the La.Const. art. 8 § 10(b) to have become effective 1977.

8. As of 1980, of the total population of Ouachita Parish, 139,241, over 50% reside in Monroe and West Monroe:

| | |
|---|---|
| Monroe | 57,597 |
| West Monroe | 14,993 |
| TOTAL | 72,590 |

U.S. Bureau of Census, Population and Housing Series, PHC 80–V–20, U.S. Government Printing Office, Washington, D.C., 1981.

A like percentage of residents of voting age is a fair assumption. Out of a total Louisiana 1980 population of 4,203,972 (Table No. 855), estimated population of voting age reflects a total of 2,780,000 or approximately 66.13%, U.S. Bureau of Census Current Population Report, Series P–20, No. 359, U.S. Government Printing Office, Washington, D.C., 1981.

tax revenue. But here again, it is the people living within the city that supply most of the revenue on which the schools depend for operation and survival. Indeed, this is reflected in great detail in the opinion by Judge Dawkins in *Rutledge v. State of Louisiana*, 330 F.Supp. 336 (W.D.La., 1971), which was cited by the District Court in note 53. (R. 87–88). The plaintiff there sought declaratory and injunctive relief to prevent the residents of the city of Monroe from voting in the election of or from electing members to the parish school board as provided by the applicable state statute as interpreted by the Louisiana Supreme Court. In the light of current census figures and pending reapportionment, the result would be that school board members elected from the city would comprise a majority on the parish board. The Court pointed out that the sources of revenue derived for its operations by the Ouachita Parish School Board were (i) from the state 61.2%, (ii) from Ouachita Parish 27.6%, (iii) from federal sources 9.1%, and (iv) from non-revenue sources 2.1%. The Court went on to point out that the largest single source of revenue included under "Parish" (ii) revenue is from sales tax collections for the support of the schools of both systems. The sales tax is collected from residents both inside and outside the city of Monroe, as well as from many non-residents of the parish, by the city tax collector. The receipts are distributed on the basis of average daily student attendance in the respective school systems. Showing the disproportionate burden borne by the residents of the city in the financial support of the Ouachita Parish schools, the Court went on to state:

> While approximately 67% of this tax is collected from within the city of Monroe,

62% is paid to the Ouachita Parish School Board.

*Id.* at 340.

Not only was there a direct political connection and a pooling of fiscal support borne disproportionately by residents of the city—both systems operated for the benefit of the children of both areas until the decree here under review. It is the principal, if not sole, business of a school system to educate and teach children. Of the 18,000 plus students in the Ouachita Parish system during 1977–78 (*see* App. III, R. 93), a total of 2,343 city residents attended parish schools (R. 60). Approximately 7.5% of the students taught, cared for and educated by the parish were from the city.[9] This was the result of a mutually approved and occasionally judicially recognized right on behalf of any given pupil, subject only to the 1969 freeze order, to choose between City or Parish schools regardless of the place of residence. The city attendees were not, as is sometimes the case, simply casual transferees. In total number they represented a significant part of the student body and the correlative obligations on the part of the administration for their care and education. When this is done with the unqualified approval of the administration of both systems, and the substantive and administrative responsibilities rest willingly on the parish board, it cannot reasonably be urged that the two systems are truly separate and autonomous.[10]

In the approach that I believe the facts compel, the two separate school systems are not truly independent and autonomous in the *Milliken* sense, and because both of them reflect continuing unconstitutional racial discrimination, the *intent* to discrimi-

---

9. Added to the fact of substantial attendance by city children in parish schools, the District Court's opinion (*see* note 46, R. 86) lists by name the parish elementary school zones, junior high school zones and high schools zones that overlap Monroe City, which includes Ouachita Parish Junior High and Ouachita Parish High School, each physically located within the city limits of Monroe.

10. I recognize, of course, that the District Court's order acquiesced in by us nominally puts an end to this crossover between city-parish. This goes only to remedy. What I am urging is that this long continued historic practice of both systems to accept the pupils coming from the other demonstrates dramatically that both systems were engaged in the business of educating *all* of the children of Ouachita Parish, and hence were not, in the *Milliken* sense, separate and autonomous.

nate can be presumed. The District Court in relying on our cited decisions was correct in holding that these facts justify "the presumption of an intent to discriminate on the part of local school authorities." (R. 69). *United States v. DeSoto Parish School Board*, 574 F.2d 804, 813 n.20 (5th Cir.), *cert. denied*, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978); *Lee v. Demopolis City School System*, 557 F.2d 1053 (5th Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978). And to those must also be added *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Keyes v. School District Number One*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

If—on my hypothesis that the two systems are not really separate and autonomous in the *Milliken* sense—there is nevertheless the need for proof under *Milliken* of Segregative *effect*, then the record clearly justifies that conclusion. First, as this Court points out (*Taylor*, at 967), the District Court, with ample evidence, plainly held:

> The segregative effect of this interdistrict overlap is highlighted by the fact that the cities attendance zones will soon experience substantial revisions via a new desegregation plan . . . . If the overlap is maintained, any attempted plan to further desegregate the MCSS will be futile. A white or black student assigned to a city school where his race is in the minority would simply opt to attend the parish school where his race is in the majority . . . . Clearly, there is a substantial segregative effect caused by the overlapping student attendance zones between the parish and the city system. (R. 62–63).

The District Court further stated:

> [I]t is apparent that accumulative segregative effect occurs in the MCSS as a result of the overlap in attendance zones between the city system and the parish system. . . . If parish students are allowed to attend city schools, the identical effect sought to be avoided in the city

system will occur—a student will be able to escape any parish desegregation plan by opting out of the parish system and attending the city system where his race may be in the majority. Accordingly, it is the opinion of this Court that the reciprocal transfer provisions between the city and the parish and the parish and the city have a substantial segregative effect on the two systems. (R. 67).

Indeed, the majority does not reject these findings: We "need not here quibble with the Judge's factual finding of significant segregative effect. . . ." (*Taylor*, at 966).

In this case, the lack of geographical integrity of the city and parish systems, the widespread use of interdistrict (i. e., cross-district) busing, the political participation of city residents in the parish school board and the dependence of both systems on a shared parish-wide sales tax all indicate that autonomy factors in this case presented a less than compelling state interest.

Even if these two school systems are sufficiently separate and autonomous in the *Milliken* sense, the law certainly does not compel direct evidence to warrant a finding of the intent to discriminate. The Court in *Keyes, supra*, established the principle that purposeful discrimination in a substantial part of a school system furnishes a basis for a finding of system-wide discriminatory intent, 413 U.S. at 203, 93 S.Ct. at 2695. And *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), held that failure of officials in an historically dual system to take affirmative steps that effectually dismantle its dual school system constitutes continuing violations of the equal protection clause. 402 U.S. at 17, 91 S.Ct. at 1276. Although the Supreme Court's decisions in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), reiterate that intent is a necessary element to an equal protection violation, both *Davis* and *Arlington Heights* cited *Keyes* with approval. Neither of these cases purport to alter the

rules that had been developed as to proof of *de jure* school segregation.

Indeed, in *Columbus Board of Education v. Penick*, 443 U.S. 449, 458 n.7, 99 S.Ct. 2941, 2947 n.7, 61 L.Ed.2d 666, 677 n.7 (1979), and *Dayton v. Brinkman*, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720, 734 (1979) (Dayton II), the Supreme Court again emphasized the continuing vitality of the *Keyes* and *Swann* presumption. The Court explicitly rejected arguments that "direct" evidence of discriminatory intent was required to prove Fourteenth Amendment violations in systems which were historically segregated *de jure*.

In systems such as these two in which segregation was historically *de jure,* so that an affirmative duty to desegregate exists, governmental actions or inactions that courts have found to raise the required inference of intentional discrimination are all present here:

(i) Maintenance of a large number of single race schools;

(ii) New construction of schools that perpetuate racially identifiable schools;

(iii) Use of optional attendance zones to promote segregation.

Items (i) and (iii) are certainly present here.[11] In both systems the District Court with ample basis found continuing extensive intentional discrimination which began *de jure* (*see* note 3, *supra*). In addition, both the city and parish maintained the interdistrict attendance option by which up to ⅓ of all city white students could go across the city limits to the whiter parish system.

Not to be forgotten is the unique structure and relationship between these two systems. The city of Monroe is located within the borders of Ouachita parish and it is one of only two Louisiana cities having a school board that is distinct from the parish board. Prior to the District Court's May 19 order which granted limited interdistrict relief, all Monroe city residents belonged to both the city as well as to the parish school district, and the entire city of Monroe was covered by overlapping city and parish school attendance zones. Students, living both within and without the Monroe city limits, could choose to attend the city or parish schools. No majority to minority transfer provision limited this migration. The parish board operated a large number of bus routes within the city limits for students who had elected to attend parish schools. In the past, the city had operated buses outside the city limits to bring parish students to city schools. The parish's largest elementary/junior high school and one of its largest high schools were located within the city limits of Monroe. Residents of the city participated in the governing of the parish as well as the city boards by voting in both parish and city board elections. Because three of the six parish board districts were composed primarily of city precincts, three of the six parish board members generally were city residents. A principal source of revenue for both the city and parish school districts is a single parish-wide sales tax.

It would be nice to sluff off—but it would detract from what this Court has done since 1957—to dispose of this problem as neatly as does the Court. Starting off that these "concentric school districts share a general problem: vestiges of an earlier *de jure* system of school segregation" (*Taylor*, at 968), the Court then reaches the mighty climax:

But they cannot, true to the requirement of *Milliken v. Bradley* share a common solution.

For two systems that exist not only in the same area covering all of the students in the parish, with a free transfer by any pupil to choose the option to go into the schools of one rather than the other, both of which are steeped in unconstitutional discriminatory conduct mandating vigorous action for eradication these many years later, it is insupportable to somehow treat this as in-

11. I bypass group (ii) because of the peculiar procedural problems (*see* the Court's opinion,

*Taylor,* 648 F.2d at 971 and note 1, *supra*).

nocent and highly individualized participation by each, unrelated to the other. Without the limited interdistrict remedy afforded, this would have permitted the continuation of crass discrimination and the unique opportunity, as the Court itself recognizes (*Taylor*, at 968), for all to avoid either desegregation decrees or the necessity for "white flight" by the simple act of the child on the opening day of his school career, or more likely, that of his more interested parents choosing, if white, attendance in the parish system. With the identity of political influence, significant operating revenues and the children willingly subject to the care, attention and education of either one or both systems, it turns back history to cast them each adrift on the idea that the "problems of segregation within the city and the parish systems are properly redressable ... in appropriately separate proceedings" (*Taylor*, at 969).

On my hypothesis that the two systems are not really separate and autonomous, when we speak of remedy, it is not accurate to describe this as "interdistrict". But whether characterized as "intradistrict" or "interdistrict," some kind of effective relief must apply to both entities. The District Court's obliteration of attendance options and overlapping attendance zones is a good start, but it is only a start.[12] The District Court needs to be instructed that some such character of interdistrict relief covering both must be issued. What that relief ought to be, what form it should take, I would leave to this very careful District Judge.

Because the Court does not so instruct him I must dissent.

12. Even the limited interdistrict relief granted by the District Court—in which I concur and to which the Court gives only a nonenthusiastic acquiescence—in ordering the obliteration of cross-assignment options and the elimination of overlapping attendance zones, is not the end. The District Court's opinion affirmatively recognizes that transfers under this restrictive decree "shall be allowed" if they meet the standards of *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1218–19 (5th Cir. 1971) (*see* note 55, R. 88).

The *Singleton* decision sets forth these guidelines on interdistrict transfers:

If a school district grants transfers to students living in the district for their attendance at public school outside the district, or if it permits transfers into the district of students who live outside the district, it shall do so on a nondiscriminatory basis, except that it shall not consent to transfer where the cumulative effect will reduce desegregation in either district or reinforce the dual system. (R. 88).