UNITED STATES of America, Plaintiff,

Sheanda Bryant, et al.,
Intervenors-Appellants,
Cross-Appellees,

v.

LAWRENCE COUNTY SCHOOL DISTRICT, et al., Defendants-Appellees,
Cross-Appellants.

No. 86–4047.

United States Court of Appeals,
Fifth Circuit.

Sept. 15, 1986.

Suzanne Griggins, Mendenhall, Miss., for intervenors-appellants, cross-appellees.

Frank D. Allen, Jr., U.S. Dept. of Justice, Appellate Sec., Civil Div., Washington, D.C., Kenneth Rutherford, Jackson, Miss., Wm. Bradford Reynolds, Brian K. Landsberg, U.S. Dept. of Justice, Appellate Sec., Civil Div., Washington, D.C., Dale F. Schwindaman, Jackson, Miss., Malcolm Rogers, Monticello, Miss., for defendants-appellees, cross-appellants.

Jeanne Pettanati, Educational Opportunities Litigation Section, U.S. Dept. of Justice, Washington, D.C., for other interested parties.

Before WISDOM, RUBIN, and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A school board that had unconstitutionally segregated students by race was ordered by this court in 1969 to desegregate in accordance with a plan incorporated into this court's decree. After the case had been remanded to the district court, the school board violated some of the terms of the desegregation order. The key issues are whether the school system has previously been declared unitary in the sense of being desegregated, and, if not, whether the court is now limited to ordering the school board to comply with the original desegregation plan or whether the court may order changes in the plan in an effort to further the establishment of a unitary school district—i.e., a district in which schools are not identifiable by race and students and faculty are assigned in a manner that eliminates the vestiges of past segregation.

## I.

Lawrence County is a rural county in south-central Mississippi. Its total population is 12,518, 30% of which is black, and its student population is 2,781, 44% of which is black. The county has only two towns of any size, Monticello and New Hebron. Monticello is located in the county's center and has a racially mixed population of 1,834, 20% black. New Hebron is located in the extreme northeastern part of the county, and its population of 470 is predominantly white. Silver Creek, a community about eight miles south of New Hebron, is predominantly black and has a population of about 300.

As shown on the county map attached, Pearl River divides the county from its north-central to southeastern boundaries. In the county, the river is crossed by bridges in two places, one on U.S. Highway 84, the main road through Monticello, and the other on a secondary road north of the town. The population in the southwestern part of the county, which is on the west side of Pearl River, is predominantly white. The population living on the east side of Pearl River, south of New Hebron, is predominantly black, as is the population in the northwest-central part of the county, west of Pearl River.

Nineteen years ago, in 1967, the United States sued the Lawrence County School District, seeking to eliminate state-imposed segregation by race in that county's public schools. The county then had seven schools, five for white students, with white faculty, and two for black students, with black faculty. In 1969, the Supreme Court ordered the Fifth Circuit to take original jurisdiction of this and other Mississippi school desegregation cases and to take immediate steps to desegregate the school systems.[1] This court approved a plan of desegregation proposed by the United States and ordered that it be tested at an evidentiary hearing before District Judge

---

1. *Alexander v. Holmes County Bd. of Educ.*, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

Dan M. Russell, Jr. After that hearing, and in accordance with Judge Russell's recommendations, this court adopted the proposed plan. The plan contains provisions similar to those mandated by our opinion in *Singleton v. Jackson Municipal Separate School District.*[2] It includes requirements that:

(1) The School Board assign teachers and staff to each school "for the school year 1969–70 *and subsequent years*" so that "the racial composition of a staff [will not] indicate that a school is intended for Negro or white students" and so that "the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, *in the entire school system.*" (Emphasis added.)

(2) "The transportation system be completely reexamined regularly by ... the school board. Bus routes and the assignment of students to buses [are to] be designed to insure the transportation of all eligible pupils in a non-segregated and otherwise non-discriminatory basis."

(3) "All school construction, school consolidation, and site selection ... be done in a manner which will prevent the recurrence of the dual school structure...."

(4) The transfer of students who reside in a district other than the one in which they wish to attend school be permitted only on a "non-discriminatory basis" and the Board is not to "consent to transfers where the cumulative effect will reduce desegregation in [this or a neighboring] district or reinforce the dual school system."

This court's 1969 decree ordered continued operation of the seven schools; two of the schools were to include high school grades as well as elementary grades. The order divided the county into three attendance zones: the northeast zone had one school, the center zone six, and the southwest one. In 1974, after the case had been dormant for almost five years, this court transferred original jurisdiction back to the district court, stating that it appeared the school system "has been and is being maintained as a unitary school system" in compliance with this court's 1969 order. Following the transfer of jurisdiction to the district court, the case remained inactive for a decade.

In 1984, the United States filed a motion to enforce the 1969 order. After a two-day evidentiary hearing, Judge Russell found that the Lawrence County School District had "failed utterly" to comply with that part of the order forbidding the district to permit white students from adjacent counties to attend Lawrence County schools if the effect would be to reduce desegregation. The School District had been permitting white students from Simpson County to attend the predominantly white New Hebron school in Lawrence County. "These transfers," Judge Russell stated, "have the effect of reinforcing the dual school system. The school which was traditionally white, New Hebron, remains so, and in much higher percentages than reflected in the county's population." He went on to find that the public perception of certain schools "has not changed and cannot begin to change until the situation is rectified." Despite the fact that the "Board has been under Court order since 1969 regarding accepting students from other counties," Judge Russell found that the Board had "failed to perform even one solitary act to bring itself into compliance with that order."

Later in 1984, the Lawrence County School Board overcame defeats by voters in 1980 and 1983 by obtaining county voter approval of a $4,000,000 bond issue for the construction and renovation of schools. Some of the planned buildings have been completed or are under construction: a new classroom building at New Hebron (the sole school in the northeast zone); ad-

2. 419 F.2d 1211 (5th Cir.1969).

ditional classrooms and a new "cafetorium" at Topeka-Tilton (the sole school in the southwest zone); and repairs and renovations at two of the schools in the center zone, McCullough Junior High and Monticello High, as well as at Topeka-Tilton. In addition, the School District plans to build a vocational-technical center at Monticello, in the central zone, to serve students who live throughout the county; a new elementary school in Monticello at a newly acquired site to replace Monticello Elementary, which is now housed in three buildings; and additional classrooms at Beulah Williams, which is also in the central zone, although near the northeastern part of the county. The location of each of these schools is shown on the attached map.

Soon after the bond issue was passed, a class of black students and their parents intervened in the suit and filed a complaint charging that the School Board had failed to operate a "unitary, non-racial" system and had violated the 1969 decree with regard to student transportation, teacher hiring and assignment, school construction plans, and the current student attendance plan. They sought a preliminary injunction to stop the expenditure of the bond revenues and the district court halted the construction of these facilities pending the trial. After a hearing, that injunction was vacated by the district court.

On appeal, this court affirmed the district court's refusal to issue a preliminary injunction. As noted above, our 1974 order had stated that the Lawrence County school system "has been and is being maintained as a unitary school system." This court's unreported 1985 opinion, a copy of which is attached, stated that, from the record, we were unable to discern whether the "unitary school system" reference in our 1974 order "meant that the school district was on the way to discharging its constitutional duties by complying with the court orders or whether at that time it had fulfilled its constitutional duty to disestablish the dual system." We affirmed the district court's denial of an injunction, but took no other action, noting that, in hearing the case on the merits, the district court

should address the question of the effect of the 1974 order.

In response to our mandate, and after a hearing, the district court held that our 1974 order returning jurisdiction of the case to the district court had not declared the system to be unitary in the sense of having accomplished desegregation. The district court also enjoined the School Board from making further construction contracts pending trial. Thereafter, the parties agreed that at the trial on the merits they would present only three questions: (1) whether the construction plan violated the School Board's duty under the Constitution and as established in the previous orders; (2) whether the Board's transportation and faculty-assignment practices also violated the previous desegregation decrees; and (3) whether the Board should be required to adopt a new or modified attendance zone plan.

At the trial, the intervenors presented seven alternative plans of desegregation to the court. Their position was and continues to be that some schools, located elsewhere in the county, should be closed and the students there should attend larger consolidated schools in Monticello. The district court held, however, that the school construction plan did not violate constitutional requirements and that a new student-assignment plan was not required. It stated that, although two of the District's six schools are "arguably racially identifiable," their disparate racial compositions are the result of geographic and demographic factors. It further found that some of the racial imbalance in the county's schools resulted from the Board's "leniency in regard to zone jumping," a practice that allows "a number of whites ... to avoid majority black schools, especially Beulah Williams," and that "strict enforcement of the attendance zones should alleviate a substantial portion of the racial imbalance by decreasing the number of whites at Topeka-Tilton and New Hebron while increasing the number of whites at Beulah Williams." The district court also found that the transportation system was not racially segregated.

The court kept the teacher-assignment issue under advisement because it viewed resolution of that issue as being closely tied to the question of teacher hiring, a matter that the parties were attempting to resolve by negotiation. 626 F.Supp. 940. In response to inquiries addressed to counsel, the court has been advised that no further negotiations have been conducted since the hearing on January 15, 1986, more than seven months ago.

The intervenors appeal the rejection of their demands and the Board appeals the ruling that the school system had not been declared unitary in 1974. At the time of oral argument in this court, counsel for the intervenors stated that most of the construction had begun or reached completion, and made no contention that the building program should be again arrested. We therefore do not address that issue.

## II.

■ On its face, the 1974 order is wholly inconsistent with absolution of the School Board or discharge of it as having fulfilled its constitutional duties. The text of the order simply recites that, because the defendants had been obeying the order already issued by this court, it was "appropriate to *transfer jurisdiction* of the case to the district court." The order required the defendants to furnish periodic reports to the district court, presumably to facilitate continued judicial supervision of the operation of the school system if necessary, and it permitted any party to remove the case from the inactive docket for "good cause shown." If the court had decided that the vestiges of segregation had been completely erased, the retention of jurisdiction would have been anomalous.

The phrase, the system "is being maintained as a unitary school district," in our 1974 order explained why the court was returning jurisdiction to the district court. This court was following the procedure required by the Supreme Court in *Alexander v. Holmes County Board of Education,*[3] which directed this court to assume plenary jurisdiction over the immediate implementation of desegregation plans in several cases, a function usually assigned to district courts. The *Alexander* opinion said this court was to "retain jurisdiction to insure prompt and faithful compliance with its order," and that it could permit the district courts to hear objections to desegregation plans "[w]hile each of these school systems is *being operated as a unitary system under the order of the Court of Appeals.*"[4] The use of the word "unitary" in the *Alexander* opinion, like its repetition in the 1974 order, did not imply a judicial determination that the school system had finally and fully eliminated all vestiges of *de jure* segregation. As used in the Supreme Court opinion, the term referred to the operation of the school system in accordance with the 1969 order under the aegis of this court. As used in this court's 1974 order, the word meant no more than that the system appeared to have been complying with the outstanding order. It should go without saying that a system does not become unitary merely upon entry of a court order intended to transform it into a unitary system.[5]

Because the potential consequences of a judicial declaration that a school system has become unitary are significant, this court has required district courts to follow certain procedures before declaring a school system unitary.[6] The court must require school boards to submit reports to

3. 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

4. *Id.* at 21, 90 S.Ct. at 30 (emphasis added).

5. *Riddick v. School Bd. of Norfolk,* 784 F.2d 521, 533 (4th Cir.1986); *Ross v. Houston Indep. School Dist.,* 699 F.2d 218, 225 (5th Cir.1983); *United States v. Texas Educ. Agency,* 647 F.2d 504, 508 (5th Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982).

6. *See e.g., Ross v. Houston Indep. School Dist.,* 699 F.2d 218, 227 (5th Cir.1983); *United States v. State of Texas,* 509 F.2d 192 (5th Cir.1975); *Youngblood v. Board of Pub. Instruction,* 448 F.2d 770 (5th Cir.1971) (per curiam); *Steele v. Board of Pub. Instruction,* 448 F.2d 767 (5th Cir.1971); *Wright v. Board of Pub. Instruction,* 445 F.2d 1397 (5th Cir.1971).

the court for three years. Before relinquishing jurisdiction, the court must give notice to the plaintiffs that it will hold a hearing to consider whether the school system should be declared unitary; at the hearing, plaintiffs have an opportunity to show cause why continued judicial supervision is necessary and the system should not be declared unitary. Finally, if no cause is shown at a hearing held for this purpose, the case may be dismissed, not merely declared inactive.

The 1974 order was not preceded by a hearing and did not direct dismissal of the case. It is not reasonable to believe that a panel of this court would have declared the Lawrence County School District finally and fully unitary without following these procedures when the court was, during that period of time, requiring district judges to adhere assiduously to the notice and hearing requirements. In an analogous situation, the Eleventh Circuit ruled in *Pitts v. Freeman* [7] that a district court not following these procedures could not have intended to declare a school system unitary even though it had, as we did in the 1974 order, used the word "unitary" to describe that system.

The Board argues that an order in which this court relinquished jurisdiction before desegregation had been accomplished would have been inconsistent with the Supreme Court mandate, but the mandate did not require this court to retain jurisdiction until the school system became fully integrated, but only to "retain jurisdiction to insure prompt and faithful compliance with *its* order." [8] The "order" to which the Supreme Court was obviously referring was the Court of Appeals order to implement a desegregation plan immediately. Once the plan had been adopted and it appeared that the order was being obeyed, it was entirely consistent with the Supreme Court's mandate for this court to send the case back to the district court for whatever additional proceedings might be required.

For these reasons, the district court correctly ruled that the 1974 order did not declare the Lawrence County School District "unitary."

Because of this conclusion, we need not address the conflict in the views of the Fourth and Tenth Circuits concerning the burden of proof that must be borne by plaintiffs who seek changes in the administration of a school system after the system has been declared unitary in the sense of being fully integrated. [9]

### III.

The approximate percentages of black student populations at the various Lawrence County schools in 1970, shortly after the desegregation plan was implemented, and in the 1985–86 school year appear in the following chart. Also shown is the most recent tabulation in the record of the percentage of black faculty in each school.

---

**7.** 755 F.2d 1423, 1426 (11th Cir.1985).

**8.** *Alexander,* 396 U.S. at 21, 90 S.Ct. at 30 (emphasis added).

**9.** *See Riddick v. School Bd. of Norfolk,* 784 F.2d 521, 537–39 (4th Cir.1986); *Dowell v. Board of*

*Educ.,* 795 F.2d 1516, 1519–20 (10th Cir.1986).

| Zone | Area | School | Pre–1970 | %Black Students Spring 1970 | Fall 1985 | %Black Teachers 1982–83 |
|------|------|--------|----------|------|------|------|
| 1 | Northeast | New Hebron (1–12) | White | 38 | 36 | 20 |
| 2 | Center | Monticello High School | White | 51 | 49 | 25 |
| | | McCullough Junior High | Black | 45 | 52 | 53 |
| | | Monticello Elementary | White | 43 | 57 | 41 |
| | | Beulah Williams Elementary* | Black | 52 | 71 | 31 |
| | | Silver Creek | White | 63 | Closed | |
| 3 | Southwest | Topeka-Tilton (1–12)* | White | 18 | 10 | 13 |

*Found by district court to be "arguably racially identifiable."

Zone 1 embraces the extreme northeastern part of the county and includes only New Hebron school, which serves twelve grades. Although the district court found that the population in this section of the county is predominantly white, that appears to be correct only if the small area in the far northeast is considered. Beulah Williams is *eight* miles south of New Hebron school in Zone 2, near the predominantly black Silver Springs community. Its student body is 71% black and its faculty, as of 1983, was 31% black.

Zone 3, which embraces the southern part of the county, also includes only one school, Topeka-Tilton, 90% of whose students and 87% of whose faculty are white. It also serves twelve grades. No schools are situated in the southeastern and northwestern parts of the county, identified by the district court as the residential areas with a predominantly black population. For school attendance purposes, the southeastern part of the county is included in the Monticello or central zone, which is Attendance Zone 2, and elementary students who live in this area are bused north to Beulah Williams. Elementary students who live in the northwestern part of the county are also bused to Monticello. Thus the School Board's pre–1969 practice was to build schools near predominantly white population centers and, save for Beulah Williams, which served a predominantly black community, to bus black students to Monticello.

The court found that, of the six schools presently in operation, two—Topeka-Tilton and Beulah Williams—were "arguably racially identifiable in that they have student bodies predominantly of one race." The intervenors contend that four of the six schools are racially identifiable.

■ The students and faculty of a school need not be all of a single race for the school to be considered racially identifiable. As stated above, ninety percent of the student body at Topeka-Tilton is white, 87% of its faculty is white, historically the school has been considered white, and it is located in an area in which the population is predominantly white. At Beulah Williams, 71% of the students in 1985 were black, compared to 52% in 1970, and, although in 1982–83 only 31% of the teachers were black, the school originally was segregated *de jure* for blacks, and is located in an area with a predominantly black population. These two schools constitute one-third of the total schools in the county and are attended by 724 students, constituting about 26% of the total student population. They are clearly racially identifiable, not merely "arguably racially identifiable" as the district court found.

While the district court referred to the New Hebron school as "predominently white" and McCullough Junior High as "historically and predominantly black," it did not consider either school to be racially identifiable. Only a year before, however, Judge Russell had referred to New Hebron as a school that had been traditionally white and so remained, "in much higher percentages than reflected in the county's population." Before desegregation, all of its students and faculty were white; today, 64% of its students and 80% of its faculty

are white. The principal of New Hebron is white, as are all of its coaches and counselors.

Furthermore, in 1981, without court approval, the Board closed the Silver Creek school. The district court stated that the intervenors "do not object to this closing," which is literally correct. The intervenors, however, do rely upon the closure without court approval as evidence of the Board's failure to follow the court-ordered plan, and also contend that the assignment to other schools of students who would have attended that school was made in a manner that retarded integration. The Silver Creek school had been a white school. Under the plan, it had been paired with the formerly black Beulah Williams school. The white students who formerly attended Silver Creek were not all required to attend Beulah Williams or another Zone 2 school, and this situation served to increase the white student population at New Hebron.

McCullough Junior High, situated in Monticello, was the second of the two schools that black students were required to attend before 1970. Fifty-two per cent of its students are black, and 53% of its faculty is black. The Department of Health, Education and Welfare, in preparing the 1970 plan, estimated that McCullough's student body would be 39% black, a ratio in reasonable conformity with the total black student population of the county, 44%. Instead, the black student population at McCullough has continued to increase.

In addition, the following evidence, not mentioned by the district court, is pertinent. Prior to the 1984 bond issue, the record shows that capital improvements had been concentrated at New Hebron and Topeka-Tilton, both historically and predominantly white schools. These two schools had received approximately 80% of the county's total expenditures. The district court, in addressing the issue of the proposed school construction plan, stated that "the evidence failed to show that New Hebron and Topeka-Tilton ... were receiv-

ing the benefits of [the 1984 bond issue] improvements to the detriment of Beulah Williams or McCullough," noting the school superintendent's testimony that school repairs are made depending on need and available funding and that schools are not discriminated against. The record evidence, however, suggests that, irrespective of present school construction plans, past attention to school facilities has been less than evenhanded.

The record persuades us that the district court was clearly in error in failing to consider New Hebron identifiably white today, as it was eighteen years ago. The district court also erred in failing to find Topeka-Tilton and Beulah Williams racially identifiable schools rather than merely "arguably" so.[10] Although the situation at McCullough Junior High is less stark, presumably because of its location in Monticello and its position as the only separate junior high in the county, we find that it too is perceived as being, and is, a predominantly black school. Thus we find that 43% of Lawrence County students attend racially identifiable schools and slightly more than 50% of the elementary students attend such schools.

The district court reasoned that geographic and demographic factors "prohibit" the "ideal result" of eliminating "arguably" racially identifiable schools, because the southwestern and northeastern sections of the county are predominantly white while the black community is concentrated in the southeastern and northwestern parts of the county. The district court concluded that strict enforcement of attendance zones will modify school enrollments sufficiently to effect a change in the racial identifiability of the schools. We find this conclusion entirely speculative. There is insufficient evidence in the record to enable the district judge or this court to compute what school enrollments would be if zone jumping ends. Whether the racial identity of the schools is ineradicable, however, is a separate question, to which we will turn. We note, how-

---

10. *See Keyes v. School Dist. No. 1,* 413 U.S. 189, 196, 93 S.Ct. 2686, 2691, 37 L.Ed.2d 548 (1973); *Price v. Denison Indep. School Dist.,* 694 F.2d 334, 358 (5th Cir.1982).

ever, that the district is relatively small and serves a rural school area that buses about 80% of the students in the county. It is evident that the Board's failure to eliminate racially identifiable schools, a more than vestigial hallmark of segregation, does not result only from toleration of white students using their freedom of choice to zone jump.

## IV.

The parties stipulated in the pretrial order that the School Board has "never adopted any faculty assignment plan," but relies on its hiring procedure for teacher assignments. They also stipulated that "the majority white schools have majority white faculties," and "in the school year 1984–85 there were only six black teachers teaching at the high school level and only three who taught core or required courses, all at Monticello High School. During this time there were forty white teachers teaching at the high school level system-wide." Under Mississippi law, principals make the recommendations for faculty employment, and the record contains testimony that, with acquiescence of the Board, principals follow a policy of maintaining the existing faculty racial ratios at each school. The intervenors also offered evidence that some positions, such as principalships and coaching positions, have never been occupied by blacks.

Nevertheless, over the protest of the intervenors, the district court deferred action on faculty assignment until it could consider the problem of hiring. This was error.[11] How teachers are hired is one question. Where new teachers, as well as incumbent teachers, who constitute the great majority of faculty, are assigned is another.[12] Seventeen years ago this court directed the Board to assign faculty each year, in order to make the racial distribution of teachers in each school comparable to the racial composition of the entire school system and to avoid perpetuating the racial identifiability of any school. This would mean that approximately 56% of the teachers in each school would be white and 44% black. As the table in Part II of this opinion shows, that proportion has been achieved in only one school, Monticello Elementary, at which the teaching staff, as of the 1982–83 school year, was 59% white and 41% black.

Assignment of existing faculty need not await nondiscriminatory hiring of new teachers. Teachers contract with the district and nothing in the record suggests that the Board is prohibited from assigning teachers to various schools within the system. The Board has no plan for assuring that teacher assignments do not reflect or promote the former or present racial identity of the schools. The original desegregation order required that just such attention be given to teacher and staff assignment, and the School Board has not complied.[13] Upon remand, the district court should evaluate the present distribution of teaching assignments and order such further relief, in the form of scheduled reports or other measures, to ensure Board compliance with its duty. The plan for the reassignment of teachers should attempt to distribute the task of teaching at schools considered less desirable between more experienced and newly hired teachers so that students who are perhaps under the greatest learning disability and in need of the best teachers are not relegated to the tutelage of novices.

## V.

The intervenors contend that bus routes have been designed so that some

---

11. Cf. Fed.R.Civ.P. 54(c); *Flannery v. Carroll,* 676 F.2d 126 (5th Cir.1982); *Burton v. State Farm Mutual Automobile Ins. Co.,* 335 F.2d 317, 320 (5th Cir.1964).

12. *See, e.g., Dayton Bd. of Educ. v. Brinkman,* 443 U.S. 526, 536, 539 n. 11, 99 S.Ct. 2971, 2978, 2980 n. 11, 61 L.Ed.2d 720 (1979); *Diaz v. San Jose Unified School Dist.,* 733 F.2d 660, 669–70

(9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985); *United States v. Texas Educ. Agency,* 564 F.2d 162, 173–74 & n. 19 (5th Cir.1977).

13. *See, e.g., United States v. DeSoto Parish School Bd.,* 574 F.2d 804, 816–17, 819 (5th Cir.), *cert. denied,* 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978).

buses are deliberately assigned to routes that enable them to transport mostly white students while others are routed to traverse primarily those areas in which black students live. The district court found that "not until 1980, more than ten years after the Fifth Circuit orders to desegregate, when a black, James Hill, became transportation director, did the district dispense with segregated bus routes for blacks and whites." The court found, however, that bus routes are not "gerrymandered to effectuate segregated buses," but that "any racial imbalance that does exist is caused by the location of black and white communities." The court did not mention the provision of the 1969 order that required bus routes and assignment of students to buses to be designed to ensure the transportation of students on a "nonsegregated and otherwise nondiscriminatory basis," or the provision requiring bus routes to be "completely re-examined regularly by the superintendent, his staff, and the school board." The intervenors offered evidence that some buses take direct routes, others circuitous ones, with the result that the rider group in many buses is racially identifiable. The county has thirty-five bus routes. On twenty-three of these routes, 75% or more of the passengers are of one race. Twelve buses are either 100% white or 100% black.

Bus riders, unlike school students, need not and in most instances cannot be perfectly balanced by race. Our 1969 order, however, clearly requires some effort by school authorities to design and redesign bus routes so as to minimize segregation of riders by race [14] and to avoid imposing "an excessive burden" on any students.[15] Hill testified that he simply redesigned the bus routes from a dual system "on [his] own." He described his plan, if it can be dignified by that term, this way: "we just pick up the kids until the bus is full." Even if, as

the district court found, the Board has not gerrymandered the routes to effectuate segregated buses, the Board has failed to comply with the 1969 order which required more of it than to avoid segregative design.

## VI.

The Board and the United States both contend that once a court orders a school board to comply with a desegregation plan the court has power only to insist on compliance with its order. The court, they state, "may not grant broader and entirely different 'relief than contemplated in an extant decree previously determined by this court to be constitutionally adequate.'" The Government also states: "A district court is without authority to *interfere further* with a school district's student assignment system when its initial order established a racially neutral plan, except as necessary to remedy subsequent segregative acts." (Emphasis added). We do not agree.

It is a nonsequitur to conclude that a district court's sole power to deal with a school board's later disregard of a constitutional desegregation order is to order compliance with the original order. The School Board's reliance for that conclusion on the Sixth Circuit decision in *Bronson v. Board of Education* [16] is misplaced. In that case the plaintiffs attempted to challenge the constitutionality of the Ohio School System a second time in the face of a prior judgment dismissing a suit raising the same issues. The *Bronson* Court recognized the prior judgment as collateral estoppel. In this case the intervenors have joined in a continuing suit to challenge the actual effectiveness of the previous court-ordered plan.

The board of a school system that has been racially segregated by state action has "an affirmative duty to deseg-

**14.** *See id.* at 810–11.

**15.** *Valley v. Rapides Parish School Bd.*, 702 F.2d 1221, 1229–30 (5th Cir.), *cert. denied*, 464 U.S. 914, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983); *see also United States v. Texas Educ. Agency*, 532

F.2d 380, 398 (5th Cir.1976), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979).

**16.** 525 F.2d 344 (6th Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976).

regate" and ensure that "racial discrimination through official action is eliminated from the system." [17] Vestiges of a racially discriminatory, dual school system may be found in faculty and staff assignments, transportation, extra-curricular activities, facilities,[18] and, of course, student assignment.[19] Schools that are racially identifiable are just such a vestige.

While judicial remedies for unconstitutional action must be targeted to elimination of the unconstitutional chancre,[20] the remedial power of a federal court that adopts a desegregation plan is not thereafter limited to enforcement of the details of the original plan. Because, as this court has previously said, a school system is not "automatically desegregated when a constitutionally acceptable plan is adopted and implemented, for the remnants of discrimination are not readily eradicated," [21] the adoption of the plan does not exhaust the power of the court to direct elimination of vestiges of segregation that remain or become apparent only after the plan has been put into place.

If a school board violates a court desegregation order, the court should of course consider whether the proposed remedy exceeds the scope of the violations. If correcting violations will suffice to wipe out the marks of past segregation, the court should not order more. If, however, it becomes evident that an integrated school system cannot be achieved simply by directing adherence to the original plan, the court may consider remedial measures that are designed to restore the victims of segregation to the position they would have occupied absent both the original discriminatory conduct and the aggravation of it by school authorities' failure to comply with corrective orders.[22] The duty of a school board that has violated the Constitution and failed to comply with a corrective court order is not merely to avoid intentionally unconstitutional acts and to promise compliance with prior court orders. Those who invoke federal jurisdiction to correct racial discrimination that has continued as a result of both noncompliance with a desegregation order and earlier *de jure* segregation need not show that the segregative practices have a current systemwide impact, as would be required to establish the right to relief *ab initio*.[23]

In Lawrence County, unlike the situation in *Pasadena Board of Education*, the School Board's failure to achieve a desegregated school system has not resulted from population migration into, out of, or within this small rural county.[24] The district court found that the post–1969 changes in the racial mix of some of the Lawrence County schools were caused by the Board's continued toleration of zone jumping, in defiance of the original decree and the later 1984 order. In addition, as we have found, the Board has engaged in other segregative actions with respect to the assignment of staff and the absence of transportation plans that have contributed to continued segregation.

The very demographic factors that separate residential areas by race in Law-

17. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 32, 91 S.Ct. 1267, 1284, 28 L.Ed.2d 554 (1971).

18. *See id.* at 18, 91 S.Ct. at 1277 (citing *Green v. County School Bd.*, 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968)).

19. *See id.*, 402 U.S. at 22–29, 91 S.Ct. at 1279–82.

20. *See, e.g., Swann*, 402 U.S. at 15–16, 91 S.Ct. at 1276; *Milliken v. Bradley*, 418 U.S. 717, 738–39, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974).

21. *Ross v. Houston Indep. School Dist.*, 699 F.2d 218, 225 (5th Cir.1983) (citing *United States v. Texas Educ. Agency*, 647 F.2d 504, 508 (5th Cir.1981); *Henry v. Clarksdale Mun. Separate School Dist.*, 579 F.2d 916, 921 (5th Cir.1978) (per curiam) (Tjoflat, J., dissenting)).

22. *Cf. Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 465–67 & nn. 13 & 14, 99 S.Ct. 2941, 2950–51 & nn. 13 & 14, 61 L.Ed.2d 666 (1979).

23. *Cf. Little Rock School Dist. v. Pulaski County Special School Dist. No. 1*, 778 F.2d 404 (8th Cir.1985).

24. *See Pasadena City Bd. of Educ. v. Spangler*, 427 U.S., 424, 434–36, 96 S.Ct. 2697, 2704, 49 L.Ed.2d 599 (1976).

rence County are in part a vestige of past segregative practices by the Board. Patently, during the *de jure* segregation era schools were built to accommodate students by race in areas where population was predominantly of a single race, and as a reasonably inferable result, parents who thereafter selected a place to live chose to reside near the racially segregated neighborhood schools. Since persons normally gravitate toward the schools that serve them, the intentional acts by the School Board before desegregation insured that the immediate communities around these schools would be of one race. What we said in *Ross v. Houston Independent School District* bears repeating: "Public school officials have a continuing duty to eliminate the system-wide effects of earlier discrimination.... They must demonstrate ... that 'current segregation is in no way the result of [their] past segregative actions.' "[25]

The effect of a racially discriminatory practice is pervasive. That effect is not eradicated by merely erasing the original cause. Just as a school board's present racial neutrality does not suffice to eliminate the effect of its past *de jure* segregative actions, correcting post-injunction racially segregative measures does not eliminate their effect. As stated in *Swann*,

[t]he objective is to dismantle the dual school system. "Racially neutral" assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court

with a "loaded game board," affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments. In short, an assignment plan is not acceptable simply because it appears to be neutral.[26]

█ Indeed, a school board that, despite court orders designed to eliminate the effects of previous unconstitutional and unlawful actions, persists in segregative actions under a veil of neutrality demonstrates the kind of continued defiance of both the Constitution and the court order that requires, not just warrants, more than an order to obey the decree.

█ The School Board had and still has a clear duty. School authorities are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."[27] And "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."[28] Finally, as this court observed in *Taylor v. Ouachita Parish School Board*,[29] "a school district with a history of operation of *de jure* segregated schools is under a continuing constitutional obligation to eradicate the vestiges of that dual school system. *The failure sufficiently to satisfy this obligation continues the constitutional violation.*"[30] The same broad equitable powers continue after violation of a court desegregation order has been proved. The post–1969 segregative actions by the Board indeed did not violate only the court's order; they also violated the fourteenth amendment.

█ This court has recognized that a federal court's power to remedy segrega-

---

**25.** 699 F.2d 218, 225 (5th Cir.1983) (citations omitted) (quoting *Keyes v. School Dist. No. 1,* 413 U.S. 189, 211 n. 17, 93 S.Ct. 2686, 2699 n. 17, 37 L.Ed.2d 548 (1973)).

**26.** 402 U.S. at 28, 91 S.Ct. at 1282.

**27.** *Id.,* 91 S.Ct. at 1275 (quoting *Green v. County School Bd.,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968)).

**28.** *Id.* 402 U.S. at 15, 91 S.Ct. at 1276.

**29.** 648 F.2d 959 (5th Cir.1981).

**30.** *Id.* at 967–68 (emphasis added).

tion is not exhausted by its issuance of a decree that promises to, but does not, work. In *Davis v. East Baton Rouge Parish School Board*,[31] we reviewed and affirmed a 1980 district court order adopting a plan that superseded a 1970 plan.[32] As in other cases,[33] we indicated no reason why the plaintiffs should not in 1974 have applied, as they did, for "further relief" on the ground that "the 1970 plan was not desegregating the system effectively."[34]

Indeed, in *Ouachita Parish School Board*, the court considered the following observation, crucial to this case, so obvious that the opinion relegated it to a footnote:

> With respect to the alleged violation in failing to decrease the number of one-race schools in its system, the parish board makes an argument that need not concern us here: that the current attendance zones were drawn up under court supervision and have been policed diligently and conscientiously by the board; any attempts to alter those zones and effect greater desegregation would have required additional court action. *How, the parish asks, can it be violating the Constitution in implementing a court-ordered plan of desegregation? We simply note that conscientious adherence to the command of Swann may require more of the school board than simply rigorous adherence to the often narrow results of the ponderous litigation machinery.*[35]

The decree is "a starting point in [the process of] shaping a remedy,"[36] although it may not, by prescribing a formula for a particular degree of racial balance, constitute an " 'inflexible requirement' to be applied anew each year to the school population within the attendance zone of each school."[37] As stated by the Supreme Court in *Swann v. Charlotte-Mecklenburg Board of Education*, "a district court's remedial decree is to be judged by its effectiveness."[38] Indeed, in *Alexander*, an opinion that concerned this very school district, the Supreme Court contemplated that the adoption of a plan would not be final, for it directed this court not only to "retain jurisdiction to insure prompt and faithful compliance with its order," but added that the court *"may modify or amend the same as may be deemed necessary or desirable for the operation of a unitary school system."*[39]

Two years after *Alexander*, the Court stated in *Swann:* "Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies *once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system."*[40] In *Pasedena City Board of Education*, the Court quoted the above passage from *Swann* and then explained:

31. 721 F.2d 1425 (5th Cir.1983).

32. *See id.* at 1428–34, 1441.

33. *See, e.g., Tasby v. Wright*, 713 F.2d 90, 91 (5th Cir.1983); *Taylor v. Ouachita Parish School Bd.*, 648 F.2d 959, 969 (5th Cir.1981), 653 F.2d 136 (5th Cir.1981) (Brown, J., dissenting); *United States v. DeSoto Parish School Bd.*, 574 F.2d 804, 817–18 (5th Cir.), *cert. denied*, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978); *Lemon v. Bossier Parish School Bd.*, 566 F.2d 985, 987, 989 (5th Cir.1978).

34. *Davis*, 721 F.2d at 1429; *see also Davis v. East Baton Rouge Parish School Bd.*, 570 F.2d 1260 (5th Cir.1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979); *East Baton Rouge School Bd. v. Davis*, 287 F.2d 380 (5th Cir.), *cert. denied*, 368 U.S. 831, 82 S.Ct. 54, 7 L.Ed.2d 34 (1961).

35. 648 F.2d at 968 n. 10 (emphasis added).

36. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971); *see also Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 434, 96 S.Ct. 2697, 2703, 49 L.Ed.2d 599 (1976).

37. *Pasadena City Bd. of Educ.*, 427 U.S. at 434, 96 S.Ct. at 2704 (citation omitted).

38. 402 U.S. at 25, 91 S.Ct. at 1280.

39. *Alexander v. Holmes County Bd. of Educ.*, 396 U.S. 19, 21, 90 S.Ct. 29, 30, 24 L.Ed.2d 19 (1969) (emphasis added).

40. *Swann*, 402 U.S. at 31–32, 91 S.Ct. at 1284 (emphasis added).

It may well be that petitioners have not yet totally achieved the unitary system contemplated by this quotation from *Swann.* There has been, for example, dispute as to the petitioners' compliance with those portions of the plan specifying procedures for hiring and promoting teachers and administrators. But that does not undercut the force of the principle underlying the quoted language from *Swann.* In this case the District Court approved a plan designed to obtain racial neutrality in the attendance of students at Pasadena's public schools. *No one disputes that the initial implementation of this plan accomplished that objective.* That being the case, the District Court was not entitled to require the PUSD to *rearrange its attendance zones each year* so as to ensure that the racial mix desired by the court was maintained in perpetuity. For having once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns.[41]

The Lawrence County situation differs from those situations addressed by the passages quoted from *Swann* and *Pasadena.* Most importantly, intervenors *do* dispute, with evidentiary support, that the school attendance plan implemented in 1969 has accomplished the objective of obtaining racial neutrality in the attendance of students in the Lawrence County schools. They also contend that elimination of zone jumping will not suffice to meet this objective. This system has not been declared unitary and the Board's "affirmative duty to deseg-

regate has [not] been accomplished." [42] The issue, then, is what this court and the district court may do in order to attain desegregation in Lawrence County.

■ An injunction is by nature an equitable decree. The power of a federal court that enters an equitable injunction is not spent simply because it has once spoken. The federal courts have always affirmed their equitable power to modify any final decree that has prospective application. As Justice Cardozo stated over half a century ago in *United States v. Swift & Co.,* "A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." [43] The "continuing responsibility of the issuing court over its decrees is a necessary concomitant of the prospective operation of equitable relief," Wright and Miller state.[44] And they add, "Inasmuch as an injunctive decree is drafted in light of what the court believes will be the future course of events, a court must continually be willing to redraft the order at the request of the party who obtained equitable relief in order to insure that the decree accomplishes its intended result." [45]

■ This court issued its 1969 decree before the Supreme Court decision in *Swann v. Charlotte-Mecklenburg School District* [46] found broader relief permissible. Even in the absence of a general equitable power to revise injunctions, the purpose and effect of this later decision should be considered if the earlier order has not succeeded in eliminating the taint of *de jure* segregation. For these reasons, we conclude that neither the district court nor this court is required to limit remedial orders to directing compliance with the 1969 decree.

**41.** 427 U.S. at 436–37, 96 S.Ct. at 2705 (citation omitted) (emphasis added).

**42.** *Swann,* 402 U.S. at 31–32, 91 S.Ct. at 1284.

**43.** 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); *see also* 7 Moore's Federal Practice ¶ 60.16[6], at 60–127 (1985).

**44.** 11 C. Wright & A. Miller, Federal Practice and Procedure § 2961, at 599 (1973).

**45.** *Id.* at 600; *see also United States v. United Shoe Mach. Corp.,* 391 U.S. 244, 248–49, 88 S.Ct. 1496, 1499–1500, 20 L.Ed.2d 562 (1968); *Exxon Corp. v. Texas Motor Exch. of Houston,* 628 F.2d 500, 503–04 (5th Cir.1980).

**46.** 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

## VII.

Despite the fact that the Board has permitted out-of-county students to attend Lawrence County schools and students living in the county to attend schools other than the one in the zone of their residence, the district court has taken no action to remedy either these direct violations of the 1969 order or their effect, finding the problem, as the brief for the United States states with sanguine aplomb, a "condition that must be remedied" and one that could be left to the negotiations then anticipated—but never yet even conducted. While the parties agreed to defer consideration of hiring, the intervenors did not agree to defer consideration of the assignment of existing faculty, and we find no reason why the district court should have postponed action on this issue pending resolution of the hiring issue.

The district court also rejected any change in attendance zones because, "with proper enforcement of attendance zones, the current plan passes constitutional muster." It added that any school consolidation would involve "extensive additional bussing." However, the intervenors' plans proposing consolidation would require busing only about 18% of the student population who are not now bused. It is clear that, although a greater measure of racial integration would require busing more students than does the present plan, greater integration could be accomplished with something less than "extensive additional busing."

■ Based on the facts we have found, some changes in school attendance zones must be implemented. "The process of desegregation ... is often one of trial and error; if one set of zones proves ineffective, then another must be drawn and, if

necessary, another, or some yet different approach be tried." [47] This part of the remedy, however, cannot be devised from on high. The district court must bear the responsibility for doing so. The record demonstrates that neither this court nor the district court can rely on the School Board to submit a plan that is constitutionally acceptable. The district court should therefore review the school attendance pattern with the assistance of a special master, if the court chooses to select one, so as to accomplish desegregation and eliminate racial identification of schools as far as possible. If a special master is selected, he should be a person with experience and a reputation for impartiality.

■ While it is not necessary that each school be a statistical image of the county's racial composition, greater balance of students by race is achievable. Of the 2,781 students who attend school in Lawrence County, 2,254 are transported by bus daily. Thus, approximately 80% of all students are now being bused.[48] The county is not large, the roads are not congested, and the schools are all accessible. The district court found that the Pearl River limits "easy access from all parts of the county to Monticello," but we find this conclusion clearly erroneous.[49] Even the School Board does not contend that Monticello is so isolated.

The distance from Beulah Williams to Monticello is only seven miles and the distance from Topeka-Tilton to Monticello but nine. New Hebron is only eight miles north of Beulah Williams. Because of the locations chosen for schools, which were designed to accommodate neighborhoods segregated by race, and the population distribution, some black children travel a longer distance by bus than most white chil-

---

**47.** *United States v. Hinds County School Bd.*, 560 F.2d 1188, 1191 (5th Cir.1977), *quoted in United States v. DeSoto Parish School Bd.*, 574 F.2d 804, 818 (5th Cir.), *cert. denied*, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978).

**48.** *See, e.g., Lemon v. Bossier Parish School Bd.*, 566 F.2d 985, 989 (5th Cir.1978) (75% of students bused).

**49.** *See id.* at 989 n. 2; *cf. Stout v. Jefferson County Bd. of Educ.*, 537 F.2d 800, 801 (5th Cir.1976) (mountainous terrain creating dangerous busing situation).

dren. In revising attendance zones, the district court shall attempt so far as practicable to spread the burden of longer bus rides so that it does not fall disproportionately on either race.

Intervenors fault the district court for refusing to order defendants to consolidate the Lawrence County schools in Monticello and offered seven different plans for doing so. One of intervenors' plans would have closed the three schools outside Monticello and assigned all students to Monticello. The other six plans would have closed various grades of the outlying schools. All would have closed Beulah Williams, a six-grade majority-black school in the community of Silver Creek, seven miles northeast of Monticello.

The district court cannot be faulted for refusing to order the full relief sought by intervenors. Consolidation of schools in Monticello goes beyond what is now required to accomplish desegregation. It would require the construction of additional facilities and the abandonment or partial abandonment of existing schools.

To eliminate the vestiges of past segregation, however, and to ensure compliance with this court's 1969 order, the district court shall:

1. Order the school board to assign teachers in compliance with the 1969 order as soon as practicable.

2. Revise attendance zones so as to reduce the degree of racial identifiability of each school and achieve, as closely as possible, a racially balanced student body at each school. In view of the fact that school is scheduled to begin soon after this order is issued, the requirement need not be implemented until the start of the 1987–88 school year. If necessary to eliminate or reduce the number of racially identifiable schools, the court shall consider directing the closing of Beulah Williams, as suggested by the intervenor's expert witness, Dr. Stolee.[50] An alternative, and perhaps preferable, measure would be pairing New Hebron and Beulah Williams. In any plan, the interest of black parents in having their children attend schools as close to home as possible should be regarded equally with the interest of white parents in this entirely justifiable desire.

In planning attendance zones, the district court should note that, as stated above, Pearl River does not limit access to Monticello from any part of the county. Indeed, Monticello is one place in the county that is accessible to all areas. Topeka-Tilton students do not need to cross the river to get to Monticello but may travel a paved highway eleven miles, a trip that takes sixteen minutes. From the northeast, the New Hebron area, there are two improved roads into Monticello, and the twenty-two mile distance takes twenty-six minutes to travel. Black students in the southeast and northwest now travel approximately the same distance to school in Monticello as would white students from the Topeka-Tilton and New Hebron zones if schools were partially consolidated or new attendance zones implemented.

In revising the attendance zones, the district court should consider the additional expense of more extensive busing but cost should not be the dominant consideration. The district court opinion is unclear as to how the financial position of the school system would be burdened by any additional busing. The school superintendent computed the added busing costs for total consolidation, the plan that involved the most additional busing, as $25,000. This is a small sum compared to the district's total expenditures of $5,846,956.06. This increased cost may also be outweighed by an increase in revenues from the state.

3. Prepare a detailed order directing the steps to be taken to prevent students whose true residence is in one school zone from attending school in another, both as the zones are now and after their modification, and to prohibit all attendance in Lawrence County schools by persons who reside outside the county.

---

50. *See Stout v. Jefferson County Bd. of Educ.,* 537 F.2d 800 (5th Cir.1976).

4. Review each bus route for its compliance with the 1969 order and direct the School Board to review routes annually and to submit annual reports stating the exact nature of the review, conclusions reached, and actions taken. The court should note that in a desegregation plan, the burdens imposed by busing should fall equally on each race as far as possible.[51] Moreover, new bus routes should be designed to fit the attendance plan to be implemented. While the Board seems wedded to the notion of busing students to their "home" school and then into Monticello for certain purposes, there is evidence that this is one of the "most unimagina-

tive" designs possible and that more efficient alternatives might be conceived.

At the time of oral argument, the United States and the School Board represented to the court that they were negotiating for a consent decree with regard to zone jumping and teacher hiring, but they have done no more. If they reach an agreement and their proposal is submitted promptly, the district court should, of course, hold a hearing on it and receive the comments of intervenors.

The judgment of the district court is AFFIRMED in part and REVERSED in part and REMANDED for further proceedings consistend with this opinion.

---

51. *Valley v. Rapides Parish School Bd.,* 702 F.2d. 1221, 1228 (5th Cir.), *cert. denied,* 464 U.S. 914, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983).

APPENDIX 1

---

APPENDIX 2

No. 84–4817

August 14, 1985

Before ALVIN B. RUBIN and THOMAS REAVLEY, Circuit Judges, and ADRIAN G. DUPLANTIER *, District Judge.

* District Judge for the Eastern District of Louisiana, sitting by designation.

Per Curiam; Concurrence by Judge ADRIAN G. DUPLANTIER.

PER CURIAM: **

In the submission of this appeal from denial of a preliminary injunction the parties treated the status of the Lawrence

** Local Rule 47.5 provides: "The publication of opinions that have no precedential value and

County School District as if there had been no order declaring the School District to have established a unitary system. Assuming that the effects of the dual school system had not been disestablished, a majority of the panel regarded the decision of the district court on the substantial likelihood of success on the merits as having been based on an incorrect legal standard.

The Board's objectives were cost savings, the retention of neighborhood schools, and voter approval of the bond issue. If the schools had not attained unitary status, there was a primary affirmative duty on the Board to eradicate vestiges of the dual school system except where inconsistent with the proper operation of the school system as a whole. *Tasby v. Este,* 517 F.2d 92, 105–06 (5th Cir.), *cert. denied,* 423 U.S. 939, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975); *United States v. Board of Public Instruction,* 395 F.2d 66, 69 (5th Cir.1968).

The district court judged the building program against the standard that the Board's duty was to take no action that would reinstate a dual school system or that would discriminate against any student on the basis of race. Since we thought, upon submission, that the district court should have judged the building program by requiring it, and the Board's plan, *to promote integration* rather than to avoid reinstating segregation, this court was disposed to enjoin further contracts and direct an expedited trial on the merits.

Before the delivery of our decision, however, we saw the docket entry that related to an order of the Fifth Circuit dated November 19, 1974 which states that this school system "has been and is being maintained as a unitary school system in compliance with the aforesaid orders...." In response to our inquiry, the attorneys disagree on the meaning and effect of that order. We are unable to determine whether it meant that the school district was on the way to discharging its constitutional duty by complying with the court orders or whether at that time it had fulfilled its constitutional duty to disestablish the dual system. If the latter effect were given the order, the district court's determination of this preliminary injunction could not be faulted.

Under these circumstances we will take no action at this time. The district court should consider halting the further execution of construction contracts until a prompt determination on the merits can be made. That court will also need to address the question of the effect of the 1974 order.

AFFIRMED. The mandate shall issue forthwith.

ADRIAN G. DUPLANTIER, District Judge, concurring:

I would affirm the trial court without reservation or qualification.

It matters not whether, in devising a construction program, a school board which is operating a system not yet declared to be unitary has a duty to promote integration rather than merely to avoid segregation or discrimination on account of race, for the Lawrence County school system has been declared to be unitary by this court.

Acting under a mandate of the Supreme Court, in 1969 this court entered an order, effective immediately, directing that the Lawrence County school system begin immediately to operate as a unitary system. *United States v. Lawrence County School District, et al,* 423 F.2d 1264 (5th Cir.1969). After supervising the operation of the school system for over four years, on January 9, 1974, three judges of this court entered an order which provides in pertinent part as follows:

merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that Rule, the court has determined that this opinion should not be published.

UNITED STATES OF AMERICA

V.

LAWRENCE COUNTY SCHOOL DISTRICT, et al

Civil Action No. 2216(H)

ORDER

Pursuant to the decision of the Supreme Court in *Alexander v. Holmes County Board of Education,* 1969, 396 U.S. 19, 0 [90] S.Ct. 29, 24 L.Ed.2d 19, this Court has retained jurisdiction of the within captioned school cases pending the desegregation of each system.

\* \* \* \* \* \*

It now appearing that the Lawrence County School District school system has been and is being maintained as a unitary school system in compliance with the aforesaid orders, and it further appearing that it would be appropriate to transfer jurisdiction of the case to the district court under a final order there to be entered as follows, it is ORDERED:

(1) Jurisdiction of No. 2216, *United States of America v. Lawrence County School District, et al,* is hereby transferred to the United States District Court for the Southern District of Mississippi;

(2) Said case may be placed on the inactive docket of that court subject to being reopened for good cause shown on the application of any party, or intervenor, or *sua sponte;*

(3) The aforesaid orders entered by this Court shall be considered as the mandate of this Court and are to be made the order of the district court;

It is an understatement to note that the three judges of this court who signed that order were familiar with school integration cases and understood the meaning and effect of a determination of unitary status. The same is true of the attorneys for the plaintiff, the United States of America, and for Amicus Curiae, both of whom approved the form of the order. In considering whether to issue a preliminary injunction in this case, the district judge was entitled, and indeed bound, to give effect to the 1974 order of this court, which is still in effect, unchanged. Because the Lawrence County school system has been judicially declared to be unitary, the trial judge applied the proper legal standard in denying a preliminary injunction.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring in part and dissenting in part:

I join the panel majority in affirming the district court's conclusion that the Lawrence County School District has not been declared technically "unitary." The District thus remains under an affirmative duty to continue taking what steps are necessary to extirpate the lingering effects of past *de jure* segregation. But I do not agree that the United States District Judge who tried this case abused his discretion by refusing to order wholesale modifications of the District's attendance plan, a plan imposed by this court and in place for nearly sixteen years. Nor do I agree that the district judge committed reversible error in postponing consideration of the teacher assignment issue or in finding that the Lawrence County school buses have been desegregated.

I

The majority's opinion paints a picture of Lawrence County and its schools that conjures images of a truly dual system that has not existed in Lawrence County for over sixteen years. Even apart from the discrepancy between this picture and the view of the district judge, who has first hand knowledge of local conditions, the majority's presentation is not supported by the paper record on which it purports to rely. The majority seems unable to accept the record as reflecting anything other than an era that no longer exists in Lawrence County, Mississippi; it looks past the clear proof of Lawrence County's progress towards eliminating the tenacious vestiges of *de jure* segregation.

Until today, every judge who has considered this case has acknowledged, either

expressly or implicitly, the significance of residential patterns and the Pearl River as obstacles to the "perfect" racial balancing of the schools. Those obstacles have not been shown to be the fault of these defendants, and neither the defendants nor the federal courts are required to impose on the students of the county, black and white, the dislocations that would be required to make every school reflect the racial composition of the District as a whole. These circumstances were taken into account in the original attendance plan *adopted by this court, see United States v. Hinds County School Board,* 433 F.2d 611 (5th Cir.1970), and later events simply do not indicate any major or unexplainable departures from that plan.[1] Certainly the majority does not show that the district court responded inadequately to any of the departures. This can be seen by examining a more complete statistical account of the changes in the schools than is provided in the majority's table.[2]

Monticello High:

| | Grades | Black | White | Total | Percent black |
|---|---|---|---|---|---|
| 1970 | 10–12 | 220 | 215 | 435 | 51% |
| 1985 | 10–12 | 175 | 180 | 355 | 49% |

McCullough:

| | Grades | Black | White | Total | Percent black |
|---|---|---|---|---|---|
| 1970 | 5–9 | 333 | 381 | 714 | 47% |
| 1985 | 5–9 | 351 | 328 | 679 | 52% |

Monticello Elementary:

| | Grades | Black | White | Total | Percent black |
|---|---|---|---|---|---|
| 1970 | 1–4 | 229 | 360 | 589 | 39% |
| 1985 | 1–4 | 304 | 234 | 538 | 56% |

New Hebron:

| | Grades | Black | White | Total | Percent black |
|---|---|---|---|---|---|
| 1970 | 1–12 | 169 | 272 | 441 | 38% |
| 1985 | 1–12 | 172 | 313 | 485 | 35% |

Topeka-Tilton:

| | Grades | Black | White | Total | Percent black |
|---|---|---|---|---|---|
| 1970 | 1–12 | 92 | 388 | 480 | 19% |
| 1985 | 1–12 | 51 | 443 | 494 | 10% |

Beulah Williams:

| | Grades | Black | White | Total | Percent black |
|---|---|---|---|---|---|
| 1970 | 1–4 | 77 | 82 | 159 | 48% |
| 1985 | 1–6 | 164 | 66 | 230 | 71% |

Silver Creek:

| | Grades | Black | White | Total | Percent black |
|---|---|---|---|---|---|
| 1970 | 5–8 | 115 | 60 | 175 | 66% |
| 1986 | [Closed] | — | — | — | — |

District-wide totals:

| | Black | White | Total | Percent black |
|---|---|---|---|---|
| 1970 | 1235 | 1758 | 2993 | 41% |
| 1985 | 1217 | 1564 | 2781 | 44% |

1. The original plan was based on a plan recommended by the United States Department of Health, Education, and Welfare, *as modified by this court. See* 433 F.2d at 613–14.

2. 1970 figures are taken from *United States v. Hinds County School Board,* 433 F.2d 611, 614 (5th Cir.1970). 1985 figures are taken from an exhibit offered by the defendants in the current phase of the case.

As this table shows, the mix of pupils has been remarkably stable over the past decade and a half. Significantly increased concentrations of black students have occurred at only two schools. Monticello Elementary and Beulah Williams, and this at a time when the percentage of black students in the District as a whole has increased. More important, perhaps, both of these facilities are elementary schools serving only the youngest children. These are the children for whom a neighborhood school has the greatest advantages, and whom we should be most reluctant to send on long bus rides every day. At Monticello Elementary, the percentage of black pupils has increased, but the result has been a school with a 56/44 racial ratio that even the majority does not contend is "racially identifiable." Although Beulah Williams has become 71% black, that school obviously took over some of the load that had been carried by nearby Silver Creek School before it was closed—and *this court* adopted the plan under which Silver Creek was 66% black.[3] In sum, these statistics simply do not suggest, let alone prove, that the defendants have been guilty of backsliding or of seeking to undermine the original attendance plan.

In arriving at the conclusion that 43% of Lawrence County's students, and over half of its elementary pupils, attend "racially identifiable" schools, the majority overlooks the close correspondence between the current student mix and the mix that we approved sixteen years ago. The majority also insists on minimizing the isolated location of Topeka-Tilton in a predominantly white area, and on characterizing New Hebron as a "white" school even though its student body is fully 35% black. Finally, the majority finds that McCullough is "racially identifiable" as a "predominantly black" school when *48% of its students are white*—an observation that sorely taxes the meaning of the words. In any event, this court has firmly rejected the artificial statistical approach to racial identifiability that the majority insists on using as the very linchpin of its decision. *See Price v. Denison Independent School District,* 694 F.2d 334 (5th Cir.1982).

Just as the statistics point toward a conclusion opposed to the one the majority embraces, so too does the evidence we have about race relations within the schools. The record contains summaries of participation in extracurricular activities, along with the 1985 yearbooks of Topeka-Tilton and New Hebron (both "white" schools according to the majority) and a 1985 yearbook covering Monticello High, Monticello Elementary, and McCullough. At both of the supposedly "white" schools, extracurricular activities (where, because of the students' freedom, significant race prejudice would be most likely to transpire) are apparently well integrated. Not only are black athletes rather obviously not excluded from participation, but organizations such as Future Farmers of America and Future Homemakers of America are integrated. Perhaps most significantly, the results of various student popularity contests fail to reflect any fundamental divisiveness. For example, blacks are well represented among the homecoming "celebrities" at both schools, and a number of extracurricular organizations have black officers; indeed, Topeka-Tilton (where 90% of the students are white) elected at least one black class president and one black vice-president. The other yearbook, which covers schools in which the races are more evenly balanced, shows the same pattern, only more clearly. The candid photographs common to public school yearbooks show children and young people black and white at play—at football games, dances and parties. Not only is there no suggestion in this record of any racial incidents over the decade and a half that the district has been under federal judicial supervision, there is no finding of discrimination in services or

---

3. Furthermore, the black students at Beulah Williams constitute only 13% of the black students in the District. This court has, in another case, approved an attendance plan under which 55% of black elementary school students would attend schools 87% or more black and 44% would attend schools 93% or more black. *Carr v. Montgomery County Board of Education,* 511 F.2d 1374 (5th Cir.1975).

disparate educational achievement; nor is there evidence that any deficiencies in the educational programs have any relevance to race, much less that they are a vestige of a *de jure* system. These facts are more informative than the equivocal statistics cited by the majority and are certainly important if we mean what we say when we deny that we are wedded to racial ratios.

Conceptual difficulties aside, even the intervenors' own expert consultant did not seek to portray the Lawrence County schools in the bleak tones of the majority's opinion. The consultant, Michael Stolee, submitted a report suggesting six different attendance plans for the schools. Although the plans vary in a number of particulars, the common element is that they would all close Beulah Williams, which suggests that that school's 71% black majority is the intervenors' core concern.[4] The Stolee report, in any event, did not claim that Beulah Williams would *have* to be closed in order to achieve desegregation, and the author makes it quite clear that he prefers larger schools because they make possible more extensive curricular choices and extracurricular activities. Whatever the merits of Stolee's educational theories, the federal courts are not charged with balancing the educational advantages and disadvantages of large versus small schools. On the other hand, whatever omissions or defects are present in the Stolee report, it at least manifests a recognition that federal courts are not obliged or permitted to ignore the educational welfare of the Lawrence County students in the pursuit of some mathematically perfect racial balancing act.

## II

Throughout the long and difficult journey of the federal courts from *Brown* to this latest case, we have emphasized the critical role of the trial judge. The local federal district judge, who is on the scene and often drawn from the community, is incomparably better equipped than we are to consider the nuances and peculiarities of each district and to exercise genuine judgment in reading demographic tabulations. This court has always displayed a considerable and appropriate deference to district judges who took bold, even very unsettling, steps to uproot the old dual school systems of the past. That same deference should be accorded to a district judge who concludes, with an abundance of record support, that desegregation can proceed without further massive judicial intervention. Indeed, one would think such deference particularly appropriate when the district judge declines to undertake radical modifications of a plan imposed by *this court*. With all deference, I find in the panel opinion more rhetoric and speculation than factual argumentation. I cannot agree that there was an abuse of discretion in the district court's refusal to order further desegregative steps that the majority itself has not been able to specify.

## A

The majority's decision is contrary to the approach of the Supreme Court, as illustrated in the following passages:

The duty of both the District Court and the Court of Appeals in a case such as this, where mandatory segregation by law of the races has long since ceased, is to first determine whether there was any action in the conduct of the business of the School Board which was intended to, and did in fact, discriminate against minority pupils, teachers, or staff.... If such violations are found, the [courts] must determine how much incremental segregative effect these violations had on the racial distribution of the ... school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a

---

4. The majority also calls Topeka-Tilton and McCullough "racially identifiable." Under two of the plans suggested in the Stolee report, Tope-ka-Tilton would remain 86–87% white. The report does not even suggest that anyone could consider McCullough racially identifiable.

systemwide impact may there be a systemwide remedy.

*Dayton Board of Education v. Brinkman,* 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977) (citations omitted).

[H]aving once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns.

*Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 436–37, 96 S.Ct. 2697, 2704–05, 49 L.Ed.2d 599 (1976).

There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting.... Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed....

*United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932).

*Brinkman, Spangler,* and *Swift* apply basic and related principles controlling the federal courts in the administration of equitable remedial power. The common thread in these cases is the requirement that a decree must always be tailored to the wrong at issue. Because of the intrusive character of the federal superintending injunction, this general principle of equity is reinforced by concerns based on federalism.

By its forward cast, an injunction contemplates change and thus must be sufficiently malleable to adapt the ordered relief to contemporary circumstances. At the same time, a fully adjudicated judgment granting an injunction must be respected in order to serve the values of repose underlying our doctrines of finality. The tension between these two propositions is accommodated by the teaching, of which *Swift* is illustrative, that a motion to modify an injunction cannot be used as an occasion for re-trying the original premises of the judgment; instead, any modification must be confined and tailored to the change in circumstance that justifies the modification.

This accommodating distinction between modification and retrial also helps adjust the tensions inherent in the extraordinary nature of the injunctive remedy. Thus, for example, in school desegregation cases, the Supreme Court has cautioned that "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). Similarly:

Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.

*Id.* at 31–32, 91 S.Ct. at 1283–84. Repeating a litany of allegations about "racially identifiable" schools will not change the fact that the Supreme Court has declined to adopt a mechanistic approach to the sensitive task of securing the constitutional rights of citizens.

B

In defense of its decision, the majority states that "[i]t is a non-sequitur to con-

clude that a district court's sole power to deal with a school board's later disregard of a constitutional desegregation order is to order compliance with the original order." However true this may be, the argument is directed at a strawman, for the district court did not rest its decision on any such ground.[5] The real non sequitur in this case is the majority's assumption that the power to modify a prior decree implies the right to reexamine its premises. Similarly, the real question in this case does not revolve around the theoretical limits of the remedial powers of a court of equity but around the question of whether this district judge abused his discretion by ordering enforcement of the existing plan. When one looks past rhetoric, the utterly *pro forma* nature of the majority's effort to show an abuse of discretion is apparent.

First, the majority purports to hold that the district court committed clear error in failing to find that New Hebron, Topeka-Tilton, Beulah Williams, and apparently McCullough, are racially identifiable. Apart from the fact that the majority's conclusion is plainly wrong as applied to McCullough and is strained at best as applied to New Hebron, the district court correctly stated and applied the law as it affects racial identifiability. The district judge noted both that racially identifiable schools are not *per se* unconstitutional and that statistical data are no more than a starting point for analysis. The district court then went on to find that the Pearl River and the residential patterns[6] in the county make the price of achieving perfect racial balance in the schools too high. The

court expressly supported this conclusion by pointing out, again correctly, that the racial mix in the schools does not differ substantially from the mix that this court imposed and approved in 1970.

At the crucial point in the district judge's opinion, he observed that the plaintiff-intervenors complain that "a number of whites cross attendance zone lines and county lines to avoid majority black schools, especially Beulah Williams." The judge then concluded that "strict enforcement of the attendance zones *should* alleviate a substantial *portion* of the racial imbalance.... [and that w]ith proper enforcement of school attendance zones, this court is of the opinion that the current school attendance zone plan in effect in Lawrence County satisfies the constitutional standard of 'promis[ing] realistically to work *now.*'" (quoting *Green v. County School Board,* 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968)). The majority asserts that the district judge's conclusion that racial imbalance would be reduced if zone jumping were prevented was "entirely speculative," ignoring the fact that this so-called "speculation" was simply the acceptance of the *plaintiff-intervenors' own submission.* Furthermore, the majority also rejects the possibility that changes in the racial composition of the schools is due to demographic changes in the county. After one eliminates zone jumping and demographic changes as possible causes of the changes, what is left? The majority never tells us. The majority does not—because it cannot—refute the district judge's conclu-

---

**5.** The district court expressly stated that the defendants' reliance on the doctrine of res judicata was without merit because "[a] school district has a continuing obligation to *seek* means of eradicating the vestiges of a dual system, a duty which may not be satisfied by rigorous adherence to a previous court order." (emphasis in original) (citation omitted).

**6.** The district court found that the "geographic separation of the races was not shown to be caused by any prior discriminatory acts on the part of the defendant." Without so much as an allusion to the record or the district court's contrary finding, the majority says that "the very demographic factors that separate resi-

dential areas by race are in part a vestige of past segregative practices by the Board, for it is patent that in the *de jure* segregation era, schools were built to accomodate students by race in areas where a single race predominated and reasonably inferrable that, as a result, parents then chose to reside near the racially segregated neighborhood schools." I do not know how we know this. Such plausible assumptions about social phenomena are not the certain stuff of judicial notice. Because we are not a legislative committee, our sources must come from the record. The pronouncement that "We know" is bereft of content, not worthy of consideration, and is no answer.

sion that the existing attendance plan, which this court devised, satisfies the constitutional standard under which it must promise to eliminate the vestiges of illegal discrimination. Instead, the majority recites—but then forgets—the constitutional standard, and leaves us with allusions to "racially identifiable schools."

The majority's inability actually to identify any abuse of discretion in the district court's decision is reflected in the majority's order on remand. The court below is instructed to "[r]evise attendance zones so as to reduce the degree of racial identification of each school and achieve, as closely as possible, a racially balanced student body at each school." With enough dislocation, of course, every school could be made to reflect the district-wide racial balance with absolute perfection. The majority does draw back from such an extreme command, adding that "[i]n any plan, the interest of black parents in having their children attend schools as close to home as possible should be regarded equally with the interest of white parents in this entirely justifiable desire." The difficulty is that this is exactly what the district judge did when he declined to order the closing of schools and the concomitant increase in the need for busing. Thus, the majority concludes that the district court abused its discretion by failing to do some undefined and unspecified something beyond what this court agreed was appropriate in 1970. I find no legal basis for this remand, which leaves the district judge with the unenviable task of attempting to implement the majority's visceral confidence that "something more" can and should be done.

### III

Persuaded, as I am, that the district court should be affirmed because it did not abuse its discretion, I need not reach the argument that that court was *required* to leave the existing attendance plan in effect unless there was proof that post–1969 changes in the racial composition of the schools were the product of purposely segregative acts by the defendants. But this argument should not be left unmentioned. It has some force, and even if not accepted in its full flower, it lends content to and informs the range of the *discretion* enjoyed by the district court.

Proving a violation of the fourteenth amendment's equal protection clause requires proof of purposeful discrimination. By itself, proof that a state agency has done something that has a disparate impact on a racially identifiable class will not show the required purposeful discrimination. *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Such discriminatory purpose has of course been a given as to school districts that maintained regimes of *de jure* segregation. But when a district has freed itself from its former *de jure* status by eliminating its dual schools, and has achieved unitary status, purposeful discrimination is no longer a given. It follows that declaring a district "unitary" is of great practical significance in the real world of imperfect proofs; it is therefore not surprising that we have required determinations of unitary status to be carefully done. It is for this reason that I, like the district court, agree that the Lawrence County School District has not been declared unitary. This, however, does not dispose of the argument that a school district can free itself from the evidentiary burdens imposed by its old *de jure* system with regard to one of its practices by implementing a constitutionally sound plan that eliminates that practice.

There are strong indications that the Supreme Court accepted this argument in *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). After quoting *Swann's* admonition that year-by-year adjustments of the racial composition of student bodies are not required after the duty to desegregate has been accomplished, the Court went on to explain that this principle extends to school districts that may not have achieved technically "unitary" status:

> It may well be that petitioners have not yet totally achieved the unitary system contemplated by this quotation from

*Swann.* There has been, for example, dispute as to the petitioners' compliance with those portions of the plan specifying procedures for hiring and promoting teachers and administrators. But that does not undercut the force of the principle underlying the quoted language from *Swann.* In this case the District Court approved a plan designed to obtain racial neutrality in the attendance of students at Pasadena's public schools. No one disputes that the initial implementation of this plan accomplished *that* objective. That being the case, the District Court was not entitled to require the [school district] to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity. For having once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns.

427 U.S. at 436–37, 96 S.Ct. at 2704–05 (emphasis in original) (citation omitted).

Allowing school districts to achieve unitary status in increments is consistent with the Supreme Court's refusal to allow systemwide remedies in the absence of deliberate discriminatory acts having systemwide effects. *See, e.g., Keyes v. School Dist. No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) (*Dayton I*); *Columbus Board of Education v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (*Dayton II*). There is no logical reason why a legal presumption of purposeful discrimination cannot be incrementally dissipated when proved purposeful discrimination is itself treated in an incremental manner. The fourteenth amendment speaks to the realities of securing equality for individuals, of ending state classifications drawn on racial lines, of honoring the worth of persons judged individually rather than by the irrelevant fortuity of race. Subscription to this vision requires that one acknowledge that there is a risk of perverse results in relying on group statistics to measure fulfillment of the constitutional promise of individual dignity. Recognition that unitary status can be achieved step-by-step would mitigate the risks of using such group measures and would help achieve a closer fit between the constitutional promise and its fulfillment.

I would not suggest that *Spangler*'s recognition of an incremental approach to the achievement of unitary status means that the implemented portion of a desegregation plan is absolutely immune from any modification. Modifications essential to the implementation of the remaining portions of the decree may be made without new proof of segregative purpose. But, as with a school district that has never practiced *de jure* segregation, the reach of the remedy should not exceed the scope of the demonstrated wrongs. Stated more concretely, the *Spangler* approach would forbid modifying the attendance plan in Lawrence County unless there is proof either that the present racial imbalances are the product of unlawful segregative intent or that a change in the plan is essential to implementing other portions of the desegregation plan, such as those having to do with teacher assignment and hiring.

Although the approach suggested by *Spangler* has significant force, my research indicates that the courts of appeals have virtually ignored it for over a decade and that the Supreme Court has not yet insisted that it be followed. For that reason, I believe that the present case can more prudently be decided using the abuse-of-discretion analysis set forth above.

## IV

The majority's treatment of the "bus routes" issue mirrors its approach to the case as a whole. The district court considered the evidence and stated: "School District transportation records establish

that some buses do have a substantial majority of riders of one race. The court's review of the bus route map does not indicate that the bus routes are gerrymandered to effectuate segregated buses. Any racial imbalance that does occur is caused by the location of black and white communities, which was not shown to be the product of past discriminatory acts." Although the majority does not dispute the district court's conclusion, it nonetheless issues a vague directive apparently requiring the district judge to pressure the defendants into taking some undefined further steps. I see no legal basis for this directive, and I dissent from its issuance.

## V

The district judge has not ruled on the issue of teacher assignment. The absence of a ruling is the result of the district court's determination of the most orderly method of proceeding. An appellate court ought ordinarily to await the trial court's decision before reversing it. I dissent from the majority's review of this undecided issue.

## VI

We need not, and I trust will not, swerve from this court's proved commitment to constitutionally secured justice, including the opportunities of public education freed of the debilitating sore of racial discrimination. But judges can err in both directions, and zealous devotion to our basic ideals must not blind us to their fragile nature. Nor should a correspondingly fierce determination not to backslide obscure the progress of this small Mississippi county that today gets the back of our hand. Federal injunctive power securing constitutional rights must be applied with balance and with firm but not crushing force. All else aside, the risks that attend the use of race to end the use of race, and the use of group measures to secure individual worth, cannot tolerate indelicate use of federal power. Our part in this delicate task demands far more deference to the trial judge than was accorded here. I would affirm the judgment of the district court, and I dissent from the decision to remand.